**CYTEC INDUSTRIES, INC., Plaintiff,**

v.

**The B.F. GOODRICH CO., Defendant.**

**No. C2–00–1398.**

United States District Court,
S.D. Ohio,
Eastern Division.

Aug. 14, 2002.

---

3. The Final pretrial remains set for March 21, 2003 at 9:00 in the undersigned's chambers.

Robert M. Robenalt, Schottenstein, Zox & Dunn, Columbus, OH, Gail H. Allyn, Morristown, NJ, for Plaintiff.

John Patrick Gartland, Vorys, Ssater, Seymour & Pease, Columbus, OH, for Defendant.

## MEMORANDUM OPINION AND ORDER

GRAHAM, District Judge.

Cytec Industries, Inc. ("Cytec") brings this action arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended by The Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601 *et seq.*, against The B.F. Goodrich Company ("Goodrich"). Cytec seeks to recover contribution from Goodrich, pursuant to 42 U.S.C. § 9613(f)(1), for costs it has incurred and continues to incur in the investigation and remediation of contamination of hazardous wastes at its facility in Marietta, Ohio. Cytec also seeks a declaratory judgment, pursuant to 28 U.S.C. § 2202 and 42 U.S.C. § 9613(g)(2), that Goodrich is liable for any future costs that Cytec may incur as a result of the ongoing environmental cleanup. This matter is before the court on the motion for summary judgment filed by Goodrich, in which it asserts that Cytec's claims are barred by the applicable statute of limitations. This motion is ripe for adjudication.

## I. STANDARD OF REVIEW

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See LaPointe v. United Autoworkers Local 600,* 8 F.3d 376, 378 (6th Cir.1993); *Osborn v. Ashland County Bd. of Alcohol, Drug Addiction & Mental Health Servs.,* 979 F.2d 1131, 1133 (6th Cir.1992)(per curium). The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact in the case at issue, *LaPointe,* 8 F.3d at 378, which may be accomplished by pointing out to the court that the nonmoving party lacks evidence to support an essential element of its case. *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.,* 12 F.3d 1382, 1389 (6th Cir. 1993). In response, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339–40 (6th Cir. 1993). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis added). *See generally Booker v. Brown & Williamson Tobacco Co., Inc.,* 879 F.2d 1304, 1310 (6th Cir.1989).

In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "

*Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir.1993)(quoting *Anderson,* 477 U.S. at 251–53, 106 S.Ct. 2505). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. *See also Gregory v. Hunt,* 24 F.3d 781, 784 (6th Cir.1994). Finally, a district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Adams v. Metiva,* 31 F.3d 375, 378 (6th Cir.1994).

## II. *PROCEDURAL AND FACTUAL BACKGROUND*

### A. *Procedural Background*

On April 5, 2002 the court granted Cytec's motion for partial summary judgment, finding Goodrich potentially liable for contribution, pursuant to 42 U.S.C. § 9613(f)(1), for a portion of the response costs that Cytec has incurred and may incur in the future for the environmental cleanup of its facility in Marietta, Ohio. *See* Memorandum Opinion and Order of April 5, 2002(Doc. 39).[1] For purposes of the present motion, the court will hereinafter refer to Cytec's facility as the "Marietta facility." Goodrich has filed a motion for reconsideration or, in the alternative, in-

---

1. This opinion is published at 196 F.Supp.2d 644 (S.D.Ohio 2002).

2. Mr. Wroblewski is the Manager of Compliance and Engineering Services with Blas-

terlocutory appeal of the Order of April 5. Inasmuch as this Order results in a final judgment in favor of Goodrich, that motion is moot.

Briefly, in its Order of April 5, the court concluded that Goodrich could be held liable for contribution to Cytec for the hazardous waste that was disposed of at the Marietta facility by Goodrich's predecessor corporation from February 6, 1926 until July 1, 1946. The issue presently before the court is whether Cytec's claim for contribution is barred by the applicable statute of limitations.

### B. *Factual Background*

This section of the memorandum opinion and order will discuss only those facts germane to the response activities (environmental cleanup) of the Marietta facility. In May, 1986 the United States Environmental Protection Agency ("USEPA") began conducting a Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.,* Facility Assessment ("RFA") of the Marietta Facility. The RFA consisted of an initial preliminary review and resulted in the identification of twenty-eight Solid Waste Management Units ("SWMUs"), which are any discernible unit where solid wastes have been placed, for further evaluation. *See* Cytec's Memorandum Contra Goodrich's Motion for Summary Judgment [hereinafter "Memorandum Contra"], Exh. 5 (Affidavit of Gary M. Wroblewski) at ¶ 7.[2] The majority of the waste treatment, storage, or disposal activities at the Marietta facility generally occurred in the following 5 areas: (1) Pond 1; (2) Pond 2; (3) North Landfill;

---

hand, Bouck & Lee, Inc. ("BBC"). BBC has been employed by Cytec to manage and carry out investigation and response activities associated with the Marietta facility since 1993.

(4) Central Landfill; and (5) South Landfill. *See id.* at ¶ 3.

In the 1980s, regulations promulgated under the RCRA prohibited the industry custom of disposing of hazardous wastes generated in chemical manufacturing plants in unlined disposal ponds, such as Ponds 1 and 2. Ponds 1 and 2 were part of the Marietta facility's wastewater system, in which Pond 1 was the primary treatment pond and Pond 2 was the secondary treatment pond. Thus, Cytec[3] would be either have to fit the Ponds with liners or close the ponds. Cytec chose the latter option. Cytec's closure plan had to be approved by the Ohio Environmental Protection Agency ("OEPA") before it could be instituted.

Cytec submitted a single closure plan for Ponds 1 and 2 to the OEPA on May 23, 1988, which the OEPA rejected on November 10, 1988. According to Michael Nau, Cytec's Marietta Facility Environmental Manager, the original plan was rejected because the "plan as submitted did not go far enough in protecting the environment." Goodrich's Motion for Summary Judgment, Exh. A. ("Nau Dep.") at p. 98. After the initial closure plan was rejected, Cytec undertook an assessment of other possible closure options. *See id.* Cytec decided to treat the two ponds as separate entities and formulate separate closure plans for each. *See id.* at pp. 98–99. According to Nau, although it had not granted formal approval, the OEPA agreed to accommodate Cytec's request to proceed with separate closure plans for Ponds 1 and 2. *See id.* at pp. 135–36. According to Goodrich, the OEPA also provided tentative approval for the proposed remedies for both ponds. The remedy selected for Pond 2 was excavation and off-site disposal of water and sludge from the pond, and for Pond 1 the possible remedies included the

disposal of Pond 1 sludge into a double-lined landfill constructed within Pond 2. *See id.* at pp. 137–38.

On September 3, 1992 the Director of the OEPA issued its "Final Findings & Orders" regarding the closure plans for Ponds 1 and 2. *See* Wroblewski Aff., Exh. D. In this order, the OEPA formally directed Cytec to submit two separate and distinct closure plans for Ponds 1 and 2. Although Cytec was required to submit separate closure plans for each pond, the OEPA subsequently determined that the ponds would be treated as a contiguous unit. *See* Reply in Support of Motion for Summary Judgment ("Reply"), Exh. 0.

Cytec submitted its closure plan for Pond 2 in November, 1992. *See* Wroblewski Aff. at ¶ 12. This plan was amended several times over the course of the following 5 years, and the OEPA did not grant final approval of the plan until August 27, 1997. *See id.* at ¶ 16. The completion of the closure of Pond 2 was approved by the OEPA on September 23, 1998. *See id.*, & Exh. I. Cytec submitted a closure plan for Pond 1 in April, 1993, and the OEPA approved the plan in September, 1996. *See* Reply, Exh. R.

Although Cytec did not receive final approval for its Pond 2 closure plan until 1997, it actually began cleanup activities in 1992. *See* Wroblewski Aff. at ¶ 13; Exh. G at p. I–2. Cytec hired a company to remove the hazardous wastes, comprised mostly of a sludge-type material, and ship it off-site. *See* Nau Dep. at p. 182. Nau testified further that the construction of the sludge removal equipment at the Marietta facility began on August 3, 1992. *See id.* at pp. 182–83; & Exh. B.

According to Nau, Cytec's decision to begin removing the sludge from Pond 2

---

**3.** Until 1993 the Marietta facility was run by Cyanamid, at which time Cyanamid spun off Cytec. In this Order, the court will refer to Cyanamid as Cytec.

before approval of the closure plan was not dictated by the OEPA. Instead, Cytec wanted to begin removing the sludge as early as possible because it had identified several cement manufacturers that were willing to recycle the sludge from Pond 2, which apparently contained ingredients which could be used in the production of cement. *See id.* at pp. 137–38.

After the "dewatering" and "desludging" equipment for Pond 2 arrived on August 3, 1992, Cytec built a concrete area on which to place the equipment. *See id.* at p. 184. Installation of the equipment was completed in late August or early September, 1992. *See id.* at p. 185. According to Nau, Cytec began removing the sludge from Pond 2 in late August or early September, 1992, but initially Cytec encountered problems because "the first press that we had on-site did not dewater the material to the satisfaction of the cement kiln" because the material had too much water in it. *See id.* at pp. 185–86. Cytec then brought in a larger press, which removed a greater portion of the water from the sludge.

The removal of the wastes from Pond 2 was completed in May, 1994. *See id.* at p. 187. In total, 42,493 tons of material was removed from Pond 2 and shipped to the cement kilns. *See id.* at p. 190. The total costs to remove the sludge and contaminated soil from Pond 2 was approximately $6 million.

The closure plan for Pond 1 was approved in September, 1996, and the cleanup of the pond began shortly thereafter. *See id.* at p. 380; Wroblewski Aff. at ¶¶ 24–28. The closure activities for Pond 1 are currently ongoing. *See* Wroblewski Aff. at ¶ 29. The cleanup of Pond 1 has thus far resulted in the removal of at least 43,000 tons of solid wastes from the pond for off-site disposal, and to date Cytec has expended at least $12 million in the cleanup of Pond 1. *See* Reply, Exhs. U & W.

In May, 1993, while Cytec was in the midst of closure activities for Ponds 1 and 2, the USEPA issued a federal RCRA Part B Hazardous Waste Management Permit ("Part B permit") to Cytec, which was necessary to implement the Federal RCRA Corrective Action Program. The Part B permit contained both Federal permit conditions and permit conditions issued by Ohio's RCRA program. *See* Wroblewski Aff., Exh. N at p. OEPA 09595.[4] Such a permit is necessary in order for the owner of the property in question, the "permittee", to manage hazardous wastes. Pursuant to the permit, Cytec had to conduct an RCRA Facility Investigation ("RFI") of the Marietta facility to evaluate the nature and extent of releases from the SWMUs that had been identified in the RFA, which, as discussed previously, had begun in May, 1986. *See* Wroblewski Aff. at ¶ 32 & Exh. N. If the RFI reveals that corrective measures are necessary for a facility, then a Corrective Measures Study ("CMS") will be conducted to evaluate the different alternatives for corrective action. *See* Wroblewski, Exh. N. at p. OEPA 9611. Once the permittee submits a CMS work plan and the USEPA accepts same, the permittee must then implement the CMS work plan, which includes studying and evaluating each alternative remedy. *See id.* at pp. OEPA 9612–13. Once the USEPA selects one or more of the remedies in the CMS work plan, it will notify the permittee of same, and the permittee will implement the selected remedy or remedies; this process is known as Corrective Measures Implementation ("CMI"). *See id.* at p. OEPA 9612.

Pursuant to the Part B permit, Cytec prepared an RFI work plan to address 26 of the 28 SWMUs, and after several revi-

4. Exhibit N is a copy of the Federal RCRA permit for the Marietta facility.

sions of the work plan, it was finalized in 1997, and RFI activities were initiated thereafter. *See id.* at ¶ 34. RFI activities are currently ongoing. The remaining two SWMU's, Ponds 1 and 2, were identified in the Part B permit, but were not included in the work plan because they were undergoing closure activities pursuant to the RCRA regulations specified in Ohio's RCRA program. *See id.* at ¶ 35.

## III. *DISCUSSION*

### A. *Waiver of Statute of Limitations Defense*

 In its memorandum contra Goodrich's motion for summary judgment, Cytec argues that Goodrich waived its statute of limitations defense because it did not raise same in its response to Cytec's motion for partial summary judgment. For the reasons set forth below, Cytec's argument is without merit.

In compliance with Fed.R.Civ.P. 8(c), Goodrich asserted the affirmative defense of statute of limitations in its Answer. *See* Answer (Doc. 9) at p. 6 (stating as its fifth affirmative defense: "The claims set forth in the Complaint are barred by the applicable statutes of limitations."). In addition, although Cytec did not then move for summary judgment on Goodrich's statute of limitations defense, Goodrich did, in its response to Cytec's motion for partial summary judgment, note that it had asserted affirmative defenses, including statute of limitations, and that it may file dispositive motions on those defenses. *See* Goodrich's Memorandum Contra Cytec's Motion for Partial Summary Judgment (Doc. 32) at p. 1 n. 1. Goodrich's compliance with Fed. R.Civ.P. 8, as well as its continued assertion of its affirmative defenses, negates any argument that it had somehow waived those defenses.

The deadline for filing motions for summary judgment in this matter was July 15, 2002. *See* Memorandum of First Pretrial

Conference Order (Doc. 16). Goodrich filed its motion for summary judgment on March 29, 2002, approximately 3½ months before the deadline. Cytec contends that Goodrich waited to see how it fared on Cytec's motion for partial summary judgment on the issue of liability before bringing forward a case dispositive motion. This contention is erroneous. Goodrich filed its motion for summary judgment six days before the court entered its Order granting Cytec's motion for partial summary judgment.

The court has reviewed the cases cited by Cytec in support of its waiver argument and finds them unavailing. Plaintiff's reliance on *United States v. Mottolo,* 26 F.3d 261 (1st Cir.1994) is misplaced because the defendant therein had failed to raise his affirmative defenses in either his answer or in his response to the plaintiff's motion for summary judgment. Thus, *Mottolo* is distinguishable. Here, Goodrich asserted its statute of limitations defense in both its answer and in its response to Cytec's motion for partial summary judgment. Likewise, the defendant in *United Mine Workers of Am.1974 Pension v. Pittston Co.,* 984 F.2d 469 (D.C.Cir.1993), also relied upon by Cytec, apparently did not assert its affirmative defenses in any pleading or motion, but instead waited until *after* the court had entered summary judgment in favor of the plaintiff before asserting them. *See Daingerfield Island Protective Soc'y v. Babbitt,* 40 F.3d 442, 445 & n. 2 (D.C.Cir. 1994) (distinguishing its previous holding in *Pittston* on the basis that the defendant currently before it had raised its affirmative defense in its answer).

Cytec also relies on two cases in which the defendants apparently plead their affirmative defenses in their respective answers but failed to mention or support those defenses in their respective responses to motions for summary judgment, and

the respective courts determined that each defendant had waived its affirmative defenses. Neither case is persuasive. In *Fofi Hotel Co. v. Davfra Corp.*, No. 92 C 2778, 1994 WL 649978, 1994 U.S. Dist. Lexis 16392 (N.D.Ill. Nov. 16, 1994), an unreported decision, the district judge concluded that because the defendants had not mentioned their affirmative defenses in their response to plaintiff's motion for summary judgment, "the Court will assume that they have abandoned them." *Id.* at *16 n. 2, 1994 U.S. Dist. Lexis 16392, at *14 n. 2. The court did not, however, provide any analysis or discussion of this issue, nor did it cite to any case law.

In *Pantry, Inc. v. Stop–N–Go Foods, Inc.*, 796 F.Supp. 1164 (S.D.Ind.1992), the court, in addressing defendant's motion for reconsideration, in which the defendant sought to preserve its right to assert affirmative defenses at trial after an entry of summary judgment on the issue of liability in favor of plaintiff, concluded that the defendant had implicitly waived its affirmative defenses by failing to argue or support them in response to plaintiff's motion for summary judgment. *See id.* at 1166–68. Without citing any case law, the court stated:

> When a party moves for a summary judgment of [sic] the issue of liability, the non-movant is thereby placed on notice that *all* arguments and evidence opposing a finding of liability must be presented to properly resolve that issue. Whether a defense counters directly the elements of a claim or otherwise excuses liability (i.e. an affirmative defense), it must be presented and supported when the embracing issue of "liability" is considered for judgment. A summary judgment on the issue of liability encompasses all affirmative defenses and implicitly challenges the non-movant to establish a basis for finding that

the defenses are both applicable and supported by the sufficient facts.

*Id.* at 1167.

The court notes, again, that Goodrich did not wait until after the court had entered summary judgment in favor of Cytec on the issue of liability before bringing its motion for summary judgment. The reasoning of the *Pantry* court is not supported by any provision of the Federal Rules of Civil Procedure nor any case law.

A decision recently issued in this district supports this court's conclusion. In *Books–A–Million, Inc. v. H & N Enters., Inc.*, 140 F.Supp.2d 846 (S.D.Ohio 2001) [hereinafter *"Books"*], the court granted the defendant's motion to strike the portion of the plaintiff's summary judgment reply memorandum that challenged the viability of the defendant's affirmative defenses. The court found that because the plaintiff's motion for summary judgment and initial memorandum in support failed to challenge, or even address, the defendant's affirmative defenses, the plaintiff could not challenge them by way of its reply memorandum. The court explained:

> In the context of summary judgment, it is well settled that the moving party *always* bears the initial responsibility of informing the district court of the basis for its motion. This initial burden remains with the moving party, even when the issue involved is one on which the non-movant will bear the burden of proof at trial, such as the Defendant's affirmative defenses in the present case. Given the Plaintiff's failure to address the Defendant's affirmative defenses in its initial summary judgment Memorandum, *the Defendant had no obligation in its opposing Memorandum to demonstrate a genuine issue of material fact with respect to those defenses.* ... Regardless of the Court's ruling on the Plaintiff's Motion, those affirmative de-

fenses will remain viable in this litigation, as the Plaintiff has not properly moved for summary judgment on them. *Id.* at 851 (emphasis added) (citations omitted); *see also Stillman v. Travelers Ins. Co.*, 88 F.3d 911, 912–14 (11th Cir.1996).

The court concludes that Goodrich has not waived its statute of limitations defense. Goodrich properly asserted the defense in its answer and mentioned it again in its memorandum contra Cytec's motion for partial summary judgment. In addition, Goodrich filed its motion well before the summary judgment filing deadline, and, although not dispositive of this issue, did so before the court ruled on Cytec's motion for partial summary judgment. Importantly, Cytec did not move for summary judgment on Goodrich's statute of limitations defense, and therefore, in accordance with *Books*, the court concludes that Goodrich was not required to demonstrate a genuine issue of fact with respect to its statute of limitations defense. Accordingly, the court will address the merits of Goodrich's motion for summary judgment.

### B. *Statute of Limitations*

■ Before addressing the question of when the statute of limitations accrued in this matter, the court must first decide which of the two statute of limitations provisions of CERCLA applies—either the provision for cost-recovery actions or the provision for contribution actions. As the court held in its Order of April 5, 2002, Cytec, as a potentially responsible party ("PRP"), may not bring a cost-recovery action under 42 U.S.C. § 9607, but instead is limited to bringing a claim for contribution pursuant to § 9613(f). Nevertheless, although CERCLA specifically provides a statute of limitations for contribution actions, courts are sometimes required to use the statute of limitations for cost-recovery actions. For the reasons set forth below,

this court will use the statute of limitations for cost-recovery actions.

The statute of limitations for cost-recovery actions states in pertinent part:

**(2) Actions for recovery of costs**

An initial action for recovery of the costs referred to in section 9607 of this title must be commenced-

**(A)** for a removal action, within 3 years after completion of the removal action . . .; and

**(B)** for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

42 U.S.C. § 9613(g)(2). The statute of limitations for § 9613(f)(1) contribution actions provides for a three-year period in which to bring a contribution action, with four different events that can trigger the time when the action accrues:

**(3) Contribution**

No action for contribution for any response costs or damages may be commenced more than 3 years after-

**(A)** the date of judgment in any action under this chapter for recovery of such costs or damages, or

**(B)** the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.

§ 9613(g)(3).

There are cases, however, in which "a party seeks contribution but none of the triggering events has occurred, [for which] Congress did not designate the statute of

limitations."[5] *Geraghty & Miller, Inc. v. Conoco, Inc.*, 234 F.3d 917, 924 (5th Cir. 2000); *see also Sun Co. v. Browning–Ferris, Inc.*, 124 F.3d 1187, 1191 (10th Cir. 1997) ("Section [9613](g)(3) establishes a three year limitations period for contribution actions, but none of the triggering events listed in that section will occur unless the PRP incurs its cleanup costs pursuant to a § [9]607 or [9]607 civil action brought by the government."). The *Geraghty & Miller* court explained that there are three basic approaches available in determining the appropriate statute of limitations to apply in a case, such as this, that is neither a cost-recovery action under § 9607 nor derivative of or responsive to any other formalized dispute, which is necessary to trigger the limitations period in § 9613(g)(3). *See id.* The three approaches are as follow: (1) follow the plain language of § 9613(g)(3) and find that there is no statute of limitations for this case; (2) use the six-year statute of limitations in § 9613(g)(2); or use the three-year statute of limitations in § 9613(g)(3) and import another triggering event from federal common law. *See id.; City of Merced v. R.A. Fields*, 997 F.Supp. 1326, 1334–35 (E.D.Cal.1998).

The Sixth Circuit has not squarely addressed this issue, but it has, in *dicta*, indicated that it would follow the second approach, as explained by the Tenth Circuit in *Sun Co. See Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 354–55 (6th Cir.1998) ("While we need not adopt the Tenth Circuit's reasoning because a statute of limitations issue is not before our court today, we note that our resolution of this case in finding that § [96]13 is not completely independent of

§ [96]07 would render a similar result."); *see also Geraghty & Miller*, 234 F.3d at 924–25 (adopting the reasoning of *Sun Co.*). After a review of the three approaches, this court finds the Tenth Circuit's reasoning in *Sun Co.* to be the most persuasive, and therefore follows the suggestion of the Sixth Circuit to follow *Sun Co.*

In *Sun Co.*, the Tenth Circuit explained that PRP's who, like Cytec here, "incur cleanup costs pursuant to a unilateral administrative order (or by a consent decree, or in some cases, voluntarily) potentially have an unlimited time in which to bring their contribution claims." *Sun Co.*, 124 F.3d at 1191. The court reasoned that in such cases the statute of limitations found in § 9613(g)(2) should be used because a contribution action under § 9613(f) is, in effect, a cost-recovery action under § 9607. *See id.* at 1192.[6] Put differently, a contribution action is really a cost-recovery action instituted by a PRP:

> [An action for contribution] is, by definition, an action for recovery of the *costs referred* to in § [96]07. In this case, because no previous action under §§ [96]06 or [96]07 has been filed with respect to this site, Plaintiffs' contribution action—while governed by the equitable principles of § [96]13(f)—is the *"initial action"* for recovery of such costs. Thus, Plaintiffs['] § [96]13(f) contribution action is the "initial action for recovery of the costs referred to in section 9607 of this title," and must be commenced "within 6 years after the initiation of physical on-site construction of the remedial action."

---

**5.** It is undisputed that none of the triggering events contained in § 9613(g)(3) has occurred in this case.

**6.** The Sixth Circuit is in accord with this conclusion. *See Centerior Serv. Co.*, 153 F.3d at 350 ("According to the plain language of § [96]13(f) ... it is § [96]07 that the establishes the cause of action for contribution.")

*Id.* at 1192 (quoting § 9613(g)(2)(B)). In rejecting the defendants' argument that the language of section 9613(g)(3) makes it clear that Congress expressly chose a three-year statute of limitations period for all contribution claims, the court explained:

> A contribution claim which is the "initial action," and thus governed by the six-year limitations period of § [96]13(g)(2), will not be commenced more than three years after any of the four enumerated triggering events, because none of those triggering events will ever occur. By contrast, if a contribution action is *not* the initial action, then by definition a previous action will have been filed, and one of the four triggering events in § [96]13(g)(3) will occur.

*Id.* at 1193. The court continued:

> In this way, Congress has provided an express statute of limitations to cover all CERCLA contribution actions, regardless of how the PRPs in question incurred their cleanup costs. In effect, there are two different types of contribution actions under CERCLA, each governed by the same equitable rules of § [96]13 and each seeking to equitably apportion costs referred to in § [96]07, but governed by different statutes of limitations.

*Id.*

This court agrees with the well-reasoned opinion of the Tenth Circuit in *Sun Co.* Otherwise, the statute of limitations for a PRP, such as Cytec, would be indefinite because a triggering event might never occur. This would undermine the certainty that statutes of limitations are designed to further.[7] *See Geraghty & Miller,* 234 F.3d at 925. Accordingly, the court will apply § 9613(g)(2) in determining whether Cytec's claim is time-barred.

The statutes of limitations under § 9613(g)(2) differ depending on whether the response activity is a "removal" action, for which the limitations period is 3 years after completion of the removal action; or whether the action is a "remedial" action, for which the action must be brought within 6 years after the initiation of physical on-site construction of the remedial action. *See* § 9614(g)(2)(A)-(B). The classification of whether the activity was a removal action or a remedial action is determined as a matter of law and can be determined on summary judgment. *See Geraghty & Miller,* 234 F.3d at 926; *Advanced Micro Devices v. National Semiconductor Corp.,* 38 F.Supp.2d 802, 809 (N.D.Cal.1999); *Raytheon Const., Inc. v. ASARCO Inc.,* No. Civ.A 96 N 2072, 2000 WL 1635482, at *13 (D.Colo. Mar.31, 2000).

"Removal" action is defined in CERCLA as follows:

> (23) The terms "remove" or "removal" mean[ ] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water

---

7. The court is, however, cognizant that some courts have strictly adhered to the § 9113(g)(3) statute of limitations provision for contribution actions. *See, e.g., Gould, Inc. v. A & M Battery & Tire Serv.,* 901 F.Supp. 906, 914–15 (E.D.Pa.1995); *Reichhold Chems., Inc. v. Textron, Inc.,* 888 F.Supp. 1116, 1125 (N.D.Fla.1995).

supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief. and Emergency Assistance Act.

§ 9601(23) (citation omitted). CERCLA defines "remedial action" as follows:

(24) The terms "remedy" or "remedial action" mean[ ] those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection, using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite piles, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.... [T]he term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

§ 9601(24).

■ Elements of remedial actions and removal actions "may overlap and semantics often obscure the actual nature of the cleanup performed." *Public Serv. Co. of Colo. v. Gates Rubber Co.*, 175 F.3d 1177, 1182 (10th Cir.1999). In fact, "[a] response action may constitute both a removal and a remedial action, and a court is not constrained to find either term applicable at the expense of the other." *Hatco Corp. v. W.R. Grace & Co.*, 849 F.Supp. 931, 962 (D.N.J.1994) (citing *General Elec. v. Litton Indus. Automation Sys.*, 920 F.2d 1415, 1419–20 (8th Cir.1999)). Courts have, however, set forth some general observations regarding each type of response activity.

■ Removal actions generally cost less, take less time, and are geared to address an immediate release or threat of release of a hazardous substance. *See Geraghty & Miller*, 234 F.3d at 926 ("removal actions generally are immediate or interim responses"); *Advanced Micro Devices*, 38 F.Supp.2d at 810 ("Removal refers to short-action taken to halt the immediate risks posed by hazardous wastes") (internal quotations omitted); *Channel Master Satellite Sys., Inc. v. JFD Elecs. Corp.*, 748 F.Supp. 373, 385 (E.D.N.C.1990) ("The courts have consistently found that the removal category was to be used in that limited set of circumstances involving a need for rapid action"); *Raytheon Constructors*, 2000 WL 1635482, at *13 (noting that removal actions are generally "only applied in that limited set of circumstances involving a need for rapid action") (internal quotations and citations omitted). Further, "[r]emoval concerns are more procedural in nature in that they speak to 'monitoring,' 'assessing,' and 'evaluating' the measures necessary to abate short-term, manageable environmental cleanup." *Rhodes v. County of Darlington, S.C.*, 833 F.Supp. 1163, 1182 (D.S.C.1992).

■ In contrast, remedial actions are usually permanent responses that address more extraordinary environmental dilemmas. *See Geraghty & Miller*, 234 F.3d at 926; *Rhodes*, 833 F.Supp. at 1182. The

Tenth Circuit explained the characteristics of remedial actions as follows:

> [A] remedial action seeks to effect a permanent remedy to the release of hazardous substances when there is no immediate threat to the public health. Remedial actions usually cost more and take longer.

*Public Serv. Co. of Colo.*, 175 F.3d at 1182. In *Rhodes,* the court explained:

> Remedial actions anticipate permanent solutions to contaminated sites. Hence, remedial actions, going to the crux of contamination, provide for substantive, complex measures of abatement and cure. Not surprisingly, remedial actions entail more expense and greater long-term planning. Remedial actions are permanent in scope and therefore require more time to prepare and implement.

833 F.Supp. at 1182; *see also Channel Master Satellite Sys.*, 748 F.Supp. at 385 ("[N]on-urgent situations are to be addressed as remedial actions").

■ A review of the National Contingency Plan ("NCP") also demonstrates the difference between removal and remedial actions. The NCP is the "regulatory template for a CERCLA quality cleanup" and it "sets performance standards, identifies methods for investigating the environmental impact of a release or threatened release, and establishes criteria for determining the appropriate extent of response activities." *Public Serv. Co. of Colo.*, 175 F.3d at 1181 (internal quotations omitted). The NCP is set forth in 40 C.F.R. pt. 300. Response activities by private parties must also comply with the NCP. *See* 40 C.F.R. § 300.700.[8] In determining the appropriateness of a removal action, the NCP requires consideration of eight specific factors. *See* § 300.415(b)(2). These factors

illustrate the immediate nature of removal activities, in that they include such factors as: actual or potential exposure to nearby human populations; actual or potential contamination of drinking water supplies; threat of fire or explosion; and other factors or situations that may pose threats to the public health. *See id.* Also instructive is the NCP provision dictating that CERCLA-fund financed removal actions may be terminated if they exceed $2 million or 12 months have elapsed since removal actions began on-site. *See* § 300.415(b)(5).

In contrast, the NCP provisions regarding remedial actions reflect an overall goal "to select remedies that are protective of human health and the environment, that maintain protection over time, and that minimize untreated waste." § 300.430(a)(1)(i); *see also* § 300.430(e)(9)(iii) (requiring that any analysis of alternatives for a remedial action give consideration to such criteria as overall protection of human health and the environment, in both the short term and long term; as well as long-term effectiveness and permanence of the alternative).

■ In determining whether Cytec's response activities constitute a "removal" action or a "remedial action," the court first addresses the parties' dispute as to whether the Marietta facility should be treated as a whole for purposes of the statute of limitations issue or whether it can be separated into distinct areas. In its motion for partial summary judgment, Cytec argued, as part of its *prima facie* case of CERCLA liability, that the Marietta facility as a whole constituted a "facility" under CERCLA. *See* Cytec's Motion for Partial Summary Judgment (Doc. 28). In response to Goodrich's motion for summary judgment, Cytec again argues that the

---

**8.** There is no dispute that Cytec's response activities complied with, and are complying with, the NCP.

Marietta facility should be treated as one facility. In the alternative, citing *Union Carbide Corp. v. Thiokol Corp.*, 890 F.Supp. 1035 (S.D.Ga.1994),[9] Cytec argues that if the court divides the Marietta facility into separate "facilities" under CERCLA, it should be considered as 3 facilities—Pond 1, Pond 2, and the remaining SWMUs. *See* Memorandum Contra at pp. 23–27. Goodrich argues that the Marietta facility should be treated as one facility and in response to Cytec's alternative argument asserts that if it is divided into separate facilities, Ponds 1 and 2, which are contiguous, joined by a pipe, and which constitute a single waste water treatment system, should be treated as one facility.

At the heart of this disagreement is the term "facility", which is defined in CERCLA as follows:

(9) The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, *or* (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9) (emphasis added). The two separate clauses, (A) and (B), are joined by the function word "or." Clause (A) contains a list of discrete, solitary structures or devices, whereas clause (B) is a description of a general geographical area where hazardous substances are located.

By joining the two clauses with the disjunctive "or", Congress indicated its intent that a choice be made between the two forms of definition of "facility." The term "or" is a function word to indicate an alternative. *See Webster's Ninth New Collegiate Dictionary* 829 (1986).[10] If Congress had intended the two clauses to merely compliment each other or provide analogous, additional possible definitions, it would have used the conjunctive "and", which is defined "as a function word to indicate connection or addition." *Id.* at 84.

■ While Congress did not indicate specifically just how a court should choose between the two clauses, it would seem logical to assume that it intended that the choice which would best serve the underlying purposes of CERCLA would be the appropriate choice in a given case.[11] This court concludes that, where appropriate, the broadest geographical definition of a facility that is appropriate under the specific facts and circumstances of a given case would likely best advance CERCA's

9. *Thiokol* is discussed *infra.*

10. *Cf. United States v. Township of Brighton*, 153 F.3d 307, 322 (6th Cir.1998) (Moore, J., concurring) (noting that the word "or" serves as a disjunctive).

11. The Sixth Circuit has yet to definitively decide this issue. In *Brighton*, the site in question was a landfill, which is specifically listed in clause (A). Judge Boggs focused on clause (B) of the definition and stated:

The words of the statute suggest that the bounds of a facility should be defined at least in part by the bounds of the contami-

nation. However, an area that cannot be reasonably or naturally divided into multiple parts or functional units should be defined as a single "facility," even if it contains parts that are non-contaminated.

*Brighton*, 153 F.3d at 313 (citation omitted). Judge Moore, in her concurring opinion, said that because the word "or" is used to separate clause(A) from (B), "an area which qualifies as one of the entities set forth in part A need not satisfy the condition set forth in part B." *Id.* at 322. In the context of the facts of *Brighton*, both of these interpretations favored an expansive definition of "facility," to wit: the entire site in question.

two underlying purposes—to ensure prompt and efficient cleanup of hazardous wastes sites and to place the costs of those cleanups on the potentially responsible persons. *See United States v. Akzo Coatings of Am., Inc.,* 949 F.2d 1409, 1416–17 (6th Cir.1991). This approach serves CERCLA's two primary purposes because it avoids piecemeal litigation, encourages a comprehensive remedy which is co-extensive with the entire geographical area affected by a release or threatened release of hazardous substances, and promotes the concept of strict liability which CERCLA incorporates. Put differently, issues relating to respective liability can best be determined in one litigation, and therefore the definition of facility should be the most geographically complete definition that is appropriate under the circumstances of a given case.

In certain cases, it may well be that the only source of a hazardous substance is one of the specific structures or devices enumerated in clause (A). In such a case, that clause would provide the appropriate definition of facility. On the other hand, there are many cases in which a site or area where hazardous substances are located will contain many of the specific structures and devices referred to in clause (A). Attempting to apply the definition of facility found in clause (A) in such cases may lead to problematic results, such as arguments separating a building from the land beneath it; or a piece of equipment, such as a tank or pipe from other parts of a property which has been operated as a unit; and the ultimate absurdity of considering each hazardous waste container in an area as a separate facility. For examples of courts rejecting or criticizing such arguments, see *Clear Lake Props. v. Rockwell Int'l Corp.,* 959 F.Supp. 763, 768 (S.D.Tex.1997) (rejecting the argument that a laboratory building and the ground upon which it sits constitute two distinct facilities); *Axel Johnson Inc. v. Carroll Carolina Oil Co.,* 191 F.3d 409, 417–18 (4th Cir.1999) (rejecting argument that tanks and spill areas can be regarded as separate facilities when they are on an area that itself qualifies as a facility); *Thiokol,* 890 F.Supp. at 1043 (noting that "it would be ridiculous to say that each barrel in a landfill is a separate facility").

In the instant matter, if the court were to apply the literal definition of facility from clause (A), the result would be that the Marietta facility would be considered as at least six separate facilities (three ponds and three landfills) and possibly as many as twenty-eight, depending upon the precise nature of the other SWMUs. Under this approach, each separate facility would give rise to a separate cause of action under CERCLA, each of which would have a separate statute of limitations. The court concludes that this approach would not comport with the underlying purposes of CERCLA. Under such an approach, litigation expenses might equal cleanup expenses.

This court concludes that usually, although perhaps not always, the definition of facility will be the entire site or area, including single or contiguous properties, where hazardous wastes have been deposited as part of the same operation or management.

There may be cases in which the separation of a site into more than one "facility" is warranted. In *Thiokol,* the court separated different areas on a 3000 acre site into separate facilities. A landfill was considered one facility and the other SWMUs were considered separate facilities for purposes of CERCLA. The particular facts in *Thiokol* are distinguishable from the underlying facts in this case. As noted, the area in question in *Thiokol* was 3000–acres on which there were hazardous wastes of "varying origin, location, and level of risk[.]" *Thiokol,* 890 F.Supp. at

1043. The landfill was previously used for the disposal of a specific hazardous substance: "Temik/aldicarb fines," whereas the SWMUs contained other chemicals and possibly unexploded ordnance. *See id.* at 1040–43. The SWMUs were not addressed in conjunction with the landfill, but instead were treated as a separate environmental problem; further the SWMUs "were not· treated as part of a unitary CERCLA facility with the landfill. . . ." *Id.* at 1043. Finally, the response activities for the SWMUs did not begin until after the closure of the landfill. *See id.*

Here, as noted, the entire Marietta facility was the subject of a RFA beginning in May, 1986. This RFA identified twenty-eight SWMUs on the site (including Ponds 1 and 2), which are the only SWMUs that have been identified on the site. This is not a case in which some of the SWMUs on the site were identified during one regulatory inspection, such as a RFA, and other SWMUs were later identified during a subsequent, separate regulatory inspection. In addition, the RFI, which commenced in 1993, covers all the SWMUs, including Ponds 1 and 2 which were also under the supervision of the OEPA. Thus, the Marietta facility has not been separated into different areas by the USEPA, but instead has been treated as one facility. From the beginning of its operations in 1915, the Marietta facility has been used for the production of chemicals and the disposal and storage of wastes resulting from the manufacturing activities. All of the hazardous substances located on the property are the result of this continuous manufacturing activity.

In the present matter, the "facility", as that term is defined under CERCLA, is the entire fifty-four-acre site on which Cytec, its predecessors, and the other owners and operators of the Marietta facility have operated a chemical plant and waste dis-

posal area. All of the twenty-eight SWMUs identified by the USEPA are a result of the manufacturing activities conducted at the Marietta facility since the early part of the last century. The waste disposal sites include twenty-eight separate areas where both liquid and solid wastes have been deposited. These areas include not only Ponds 1 and 2, the areas mentioned most prominently in the parties' briefs, but also include a third pond which is one of the SWMUs identified by the USEPA and referred to as a cooling-water pond. Further, the entire Marietta facility is covered by one federal EPA corrective action plan, although Ponds 1 and 2 were earlier addressed by the OEPA before it attained authority over solid waste disposal sites.

▇▇ Having determined that the entire Marietta facility is a "facility", the court must determine whether the response activities at the facility constitute a removal action or a remedial action. For the reasons set forth below, the court concludes that all of the activities to date have been part of a remedial action.

It is Cytec's contention that all of its response activities to date have been removal actions because no lead agency (USEPA or OEPA) has granted final approval of the overall cleanup for the Marietta facility. Thus, Cytec urges the court to adopt a "bright-line" rule under which the formal adoption of a final remedy is the cutoff between "removal" and "remedial action." The court declines to adopt such a rule.

In support of its argument, Cytec cites to the following cases: *Geraghty & Miller,* 234 F.3d at 927; *Advanced Micro Devices,* 38 F.Supp.2d at 813; and *United States v. Petersen Sand & Gravel, Inc.,* 824 F.Supp. 751 (N.D.Ill.1991). The court has reviewed these cases and finds them unper-

suasive.[12] The court instead finds persuasive the decisions of those courts which reject the argument presented by Cytec.

In *United States v. Navistar Int'l Transp. Corp.*, 152 F.3d 702 (7th Cir.1998), the Seventh Circuit, in a well-reasoned opinion, rejected the theory that a remedial action can not begin until the USEPA, or other lead agency, issues final, written approval of the remedial design for the site at issue. *See id.* at 711–12. The court explained:

> The statute [42 U.S.C. § 9613(g)(2)(B) ] is devoid of any reference that would lead us to conclude from its plain language that Congress intended to incorporate this specific aspect of the administrative process in establishing the actions that would trigger the limitations period. On the contrary, "remedial action" is a term broadly defined by the statute—a fact of which Congress was no doubt well aware when it incorporated that term in the statute of limitations. If it had intended to require that the EPA issue its final approval of the remedial design in order for a "remedial action" to begin within the meaning of § 9613(g)(2)(B)—a contention unsupported by the definition of "remedial action"—Congress surely would have provided us with a more explicit direction to that effect.

*Navistar*, 152 F.3d at 712; *see also State of Cal. v. Hyampom Lumber Co.*, 903 F.Supp. 1389, 1392–93 (E.D.Cal.1995) (rejecting the proposition that remedial activity could not begin until the issuance of the final approval of the permanent remedy because "[t]his would make the lengthy definition of 'remedy' and 'remedial action'

appearing in § 9601(24) meaningless—the terms would simply be defined as all response activities which occur after final approval of the permanent plan"). This court would also point out that the rule proposed by Cytec would lead to the absurd result that actions brought by private parties to recover response costs in which no governmental agency was involved in the cleanup could never be classified as remedial actions because no lead agency would ever issue a final plan for the permanent remedy. *Cf. Navistar*, 152 F.3d at 712 n. 17 (noting that such a rule would result in the peculiar situation in which actions brought by private citizens in which no governmental agency participated would be subject to a different statute of limitations trigger than actions in which a governmental agency was involved in the cleanup).

The cleanup of Ponds 1 and 2 was not the result of an immediate release or threat of release of hazardous substances, but instead was the option chosen by Cytec when it had to either close the ponds or fit them with liners to comply with environmental regulations. That the cleanup of the ponds was not the result of any environmental emergency is further evidenced by Cytec's decision to ship the contents of Pond 2 to cement manufacturers for reuse. *See* § 9601(24) (including in the definition of "remedial action" "recycling or reuse" of the material). The court notes further that Cytec took the time to bring in a larger press when the original press did not remove the water from the sludge of Pond 2 to the satisfaction of the cement kilns. Thus, it appears that Cytec was not primarily concerned with the im-

---

**12.** The court notes that plaintiff's reliance on *Advanced Micro Devices* is somewhat misplaced. The court did not hold that response activities could not be considered remedial in nature until the issuance of a final remedy. Indeed, the court expressly rejected such a

proposition: "Under *Hyampom* and *Navistar*, the formal adoption of the final remedy is not a 'bright-line' cut-off between 'removal' and 'remedial action.'" *Advanced Micro Devices*, 38 F.Supp.2d at 813.

mediate removal of the hazardous waste, but instead was more concerned about accommodating the cement kilns who were reusing the wastes. In addition, Nau testified that the cleanup of Ponds 1 and 2 was to effectuate a long-term closure for those ponds. *See* Nau Dep. at p. 94. Finally, the cleanup of both ponds resulted in the removal of over 85,000 tons of hazardous wastes and at an expense of over $18 million. Nothing about the response activities for Ponds 1 and 2 are characteristic of "removal" actions.

During the cleanup of Ponds 1 and 2, the remainder of the Marietta facility became the subject of the Part B permit. The actions being taken under this permit are not removal actions, but instead are directed towards the investigation and cleanup of hazardous wastes at Cytec's remaining twenty-six SWMUs. There is no indication that those activities are being taken in response to an imminent release or threat of release of hazardous substances. In conjunction with the cleanup of Ponds 1 and 2, the actions directed to the cleanup of the other 28 SWMUs will result in a cleanup of the total Marietta facility.

In summary, the court concludes that the entire fifty-four acre Marietta facility should be treated as a "facility" as that term is defined under CERCLA. In addition, the court concludes that the response activities taken at the facility constitute a remedial action as opposed to a removal action. Thus, Cytec's claim for contribution must have been brought "within 6 years after initiation of physical on-site construction of the remedial action" in order to be timely. 42 U.S.C. § 9613(g)(2)(B). Cytec brought its action on December 13, 2000. Thus, its claim is barred if "initiation of physical on-site construction of the remedial action" occurred anytime before December 13, 1994.

In determining when physical on-site construction occurs, courts employ a four-part test. *See Hyampom Lumber,* 903 F.Supp. at 1391; *see also United States v. Akzo Nobel Coatings, Inc.,* 990 F.Supp. 897, 904–05 (E.D.Mich.1998) (citing *Hyampom Lumber* ). Under this test, in order to trigger the limitations period of § 9613(g)(2)(B), "the relevant event must possess the following attributes": (1) it must be "physical"; (2) it must have occurred "on-site"; (3) the activity must be part of the "construction of remedial action"; and (4) the activity must constitute the "initiation" of the remedial action. *Hyampom Lumber,* 903 F.Supp. at 1391. The court concludes that the beginning of construction of the concrete slab on which Cytec placed the equipment used to remove the contents of Pond 2 and the installation of this equipment constitute the initiation of physical on-site construction of the remedial action. The construction of the concrete slab and installation of the equipment began in early August, 1992. *See* Nau Dep. at p. 185 (explaining that Cytec began constructing the concrete slab on either August 1 or August 2, 1992, and that the installation of the equipment began on August 3, 1992); Motion for Summary Judgment, Exh. B.

The first two factors are met because the concrete slab and equipment were both "physical," and the concrete slab, on which the equipment was placed, was built near Pond 2 and therefore was "on-site." *See* Nau Dep. at p. 184 (describing where the concrete slab was located).

The third factor—whether a given activity constitutes "construction of the remedial action"—requires a two-part inquiry. *See id.* at 1391. First, the activity must be "remedial." *See id.* As discussed *supra,* Cytec's response activities at the Marietta facility constituted a remedial action, and the construction of the concrete slab and installation of the equipment used to remove the hazardous wastes from Pond 2

was consistent with the permanent remedy. Second, in addition to being "remedial," the activity must be part of the "construction of the remedial action." *See id.* at 1392. As the *Hyampom* court noted, "construction" is not defined in CERCLA. *See id.* The court explained, however, that the term "construction":

> [O]rdinarily connotes the creation of something that did not exist before, rather than the repair or cleansing of something that already exists.... The term ... serves the purpose of excluding those preliminary and tentative "physical on-site" activities that while related to the remedial action, are not part of its "construction."

*Id.* (citations omitted). The concrete slab was built and the equipment was installed for the sole purpose of removing the hazardous wastes from Pond 2, which was an integral part of the permanent remedy for the Marietta facility. Further, the specific equipment used by Cytec not only removed the contents (sludge) of Pond 2, but also removed the water ("de-watered") from the sludge, so that the material could be recycled or reused by the cement kilns. "Recycle or reuse" is specifically listed as a remedial action, *see* § 9601(24), and therefore construction of the concrete slab and installation of this equipment constitute "construction of the remedial activity ['recycle or reuse']." Accordingly, the construction of the concrete slab and installation of the equipment constitute "construction of the remedial activity."

The final factor, that the activity constitute "initiation" of the remedial action, is also satisfied, as the construction of the concrete slab and installation of the equipment were the first steps taken to remove the hazardous wastes from the Marietta facility; these were also the first steps taken to "recycle or reuse" the contents of Pond 2.

For the foregoing reasons, the court concludes that Cytec's construction of a concrete slab and installation of the equipment necessary to remove the contents of Pond 2 constitute the "initiation of physical on-site construction of the remedial action" for the Marietta facility. These activities occurred in early August, 1992, apparently on or near August 3, 1992, and therefore Cytec was required to bring its claim for contribution before August 3, 1998. *See* § 9613(g)(2)(B). Because it did not institute this action until December 13, 2000, its claim is time-barred.

## IV. CONCLUSION

Defendant's motion for summary judgment is GRANTED. Plaintiff's case is dismissed with prejudice. The clerk shall enter final judgment in favor of defendant. Costs shall be taxed to plaintiff.

It is so ORDERED.