ADOBE LUMBER, INC., a California corporation, Plaintiff,

v.

F. Warren HELLMAN and Wells Fargo Bank, N.A., as Trustees of Trust A created by the Estate of Marco Hellman; F. Warren Hellman as Trustee of Trust B created by the Estate of Marco Hellman; The Estate of Marco Hellman, Deceased; Woodland Shopping Center, a limited partnership; Joseph Montalvo, an individual; Harold Taecker, an individual; Geraldine Taecker, an individual; Hoyt Corporation, a Massachusetts corporation; PPG Industries, Inc., a Pennsylvania corporation; Occidental Chemical Corporation, a New York corporation; City of Woodland; and Echco Sales & Equipment Co., Defendants,

and Related Counterclaims, Crossclaims, and Third–Party Complaints.

No. CIV. 05–1510 WBS EFB.

United States District Court, E.D. California.

Sept. 8, 2009.

Howard L. Pearlman, Robert L. Waines, Bartko, Zankel, Tarrant & Miller, San Francisco, CA, for Plaintiff.

Daniel Tadeusz Dobrygowski, David C. Kiernan, James L. Mink, Thomas M. Donnelly, Jones Day, Gary J. Smith, Jia–Yn Chen, Beveridge and Diamond PC, R. Morgan Gilhuly, Laura Sue Bernard, Donald Evan Sobelman, Barg Coffin Lewis & Trapp, LLP, Robert L. Wainess, Bartko Zankel Tarrant & Miller, San Francisco, CA, Jennifer Hartman King, Steven H. Goldberg, Downey Brand LLP, Bruce Leroy Shaffer, Joseph A. Salazar, Jr., Sean David Richmond, Yamin Thuzar Maung, Lewis Brisbois Bisgaard and Smith LLP, J. Scott Smith, John A. Whitesides, Angelo Kilday and Kilduff, Sacramento, CA, Robert M. Shannon, Universal Shannon and Wheeler LLP, Roseville, CA, Brian H. Phinney, PHV, Richard S. Baron, Foley Baron & Metzger, PLLC, Livonia, MI, Kurt F. Vote, Mandy Louise Jeffcoach, McCormick, Barstow, Sheppard, Wayte and Carruth, Fresno, CA, Probal Gerard Young, Archer Norris, Walnut Creek, CA, for Defendants.

*MEMORANDUM AND ORDER RE: MOTION FOR PARTIAL SUMMARY JUDGMENT*

WILLIAM B. SHUBB, District Judge.

Plaintiff Adobe Lumber Inc. brought this action against several defendants for cost recovery, declaratory relief, contribution, indemnity, nuisance, and trespass pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675; the Hazardous Substance Account Act ("HSAA"), Cal. Health & Safety Code §§ 25300–25395; and California common law. Defendant City of Woodland ("City") now moves for partial summary judgment on plaintiff's CERCLA and HSAA claims pursuant to Rule 56 of the Federal Rules of Civil Procedure.

I. *Factual and Procedural Background*

In 1998, plaintiff purchased four parcels of land in Woodland, California, and on one of these parcels sits a commercial building and parking lot known as the Woodland Shopping Center. (*See* Riemann Decl. (Docket No. 356) ¶¶ 2–3.) Between 1974 and 2001, Suite K of the Woodland Shopping Center housed a dry cleaning business called "Sunshine Cleaners," which was operated by defendants Harold and Geraldine Taecker. (Pearlman Decl. Ex. H ("Taeckers' Resp. Req. Admis.") No. 2.)

Suite K of the Woodland Shopping Center is bordered on the west by a public alley called Academy Lane, beneath which runs a sewer owned by the City. (Pearlman Decl. Ex. G ("City's Resp. Req. Admis.") No. 3.) A floor drain in Suite K connects to the sewer through a lateral pipe. (Pearlman Decl. Ex. P at 8.) From 1974 until approximately 1991, the Taeckers used the floor drain to dispose of wastewater containing the dry cleaning solvent perchloroethylene ("PCE"), a volatile organic chemical that is considered a "hazardous substance" under CERCLA. (Pearlman Decl. Ex. M ("Taeckers' Supp. Resp. Req. Admis.") No. 6); *see* 40 C.F.R. § 302.4.

As alleged in the Third Amended Complaint ("TAC"), plaintiff retained an environmental consultant in August 2001 to conduct a limited subsurface investigation in the area around Suite K and determine whether the Taeckers' activities had affected the soil or groundwater. (TAC ¶ 34.) This investigation revealed the presence of volatile organic compounds, including PCE. (*Id.*) According to plaintiff, this subsurface contamination resulted from the leakage of PCE from the sewer beneath Academy Lane. (*Id.* ¶ 33.) Plaintiff contends that the sewer was "especially likely to leak due to ... its age, the large number of joints, grout (mortared) joints, and

defects in the sewer system" and that the City's "management and maintenance of the sewer system was re-active, minimal[,] and inadequate." (Pl.'s Stmt. Disputed Facts Nos. 31–33.)

After several communications with the Taeckers and the California Regional Water Quality Control Board ("RWQCB"), plaintiff brought a lawsuit against the Taeckers in January 2002, and several other parties were later joined as third-party defendants. (*See* TAC ¶ 37.) That action was subsequently dismissed without prejudice when plaintiffs initiated the instant lawsuit on July 27, 2005. *See Adobe Lumber, Inc. v. Hellman*, 415 F.Supp.2d 1070, 1073 (E.D.Cal.2006).

The defendants in this action include the City, the Taeckers, former owners of the Woodland Shopping Center, and the manufacturers and distributors of the dry cleaning solvent and equipment used at Suite K. (*See* TAC ¶¶ 3–18.) With respect to the City, plaintiff alleges claims of declaratory relief and cost recovery under CERCLA; declaratory relief, contribution, and indemnity under the HSAA; and nuisance and trespass under California common law. (*Id.* ¶¶ 53–106.) On October 2, 2008, 2008 WL 4539136, the court granted the City's motion to dismiss plaintiff's trespass claim. (*See* Docket No. 186.) The City now moves for partial summary judgment on plaintiff's CERCLA and HSAA claims pursuant to Federal Rule of Civil Procedure 56.

## II. *Discussion*

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Id.* at 256, 106 S.Ct. 2505. On issues for which the ultimate burden of persuasion at trial lies with the nonmoving party, the moving party bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the nonmoving party's case or by demonstrating that the nonmoving party cannot produce evidence to support an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir.2000).

Once the moving party carries its initial burden, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but must go beyond the pleadings and, "by affidavits or as otherwise provided in [Rule 56,] set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Valandingham v. Bojorquez*, 866 F.2d 1135, 1137 (9th Cir. 1989). On those issues for which it will bear the ultimate burden of persuasion at trial, the nonmoving party "must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103.

In its inquiry, the court must view any inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court also may not engage in credibility determinations or weigh the evidence, for these are jury functions. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

## A. *CERCLA and the HSAA*

CERCLA was enacted in 1980 as a broad remedial measure aimed at assuring "the prompt and effective cleanup of waste disposal sites" and ensuring that "parties responsible for hazardous substances bore the cost of remedying the conditions they created." *Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1455 (9th Cir.1986); *see* S.Rep. No. 96–848, at 13 (1980). The statute "generally imposes strict liability on owners and operators of facilities at which hazardous substances were disposed," *3550 Stevens Creek Assocs. v. Barclays Bank of Cal.,* 915 F.2d 1355, 1357 (9th Cir.1990), and where the environmental harm is indivisible, liability is joint and several, *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1198 (2d Cir.1992) (citing *O'Neil v. Picillo,* 883 F.2d 176, 178–79 (1st Cir. 1989)).

To further its purposes, CERCLA " 'authorizes private parties to institute civil actions to recover the costs involved in the cleanup of hazardous wastes from those responsible for their creation.' " *Carson Harbor Vill., Ltd. v. Unocal Corp.,* 270 F.3d 863, 870 (9th Cir.2001) (en banc) (quoting *3550 Stevens,* 915 F.2d at 1357). To establish a prima facie case in a private cost recovery action under CERCLA, a plaintiff must demonstrate that

> (1) the site on which the hazardous substances are contained is a "facility" under CERCLA's definition of that term, ... (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, ... (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan," ... and (4) the defendant is within one of four classes of persons subject to the liability provisions of [42 U.S.C. § 9607(a) ].

*Id.* at 870–71 (quoting *3550 Stevens,* 915 F.2d at 1358).

Even if a plaintiff establishes a prima facie case, however, a defendant can avoid liability through one of the affirmative defenses provided in 42 U.S.C. § 9607(b). These defenses refer to situations in which the release of hazardous substances "was caused solely by an act of God, an act of war, or certain acts or omissions of third parties other than those with whom a defendant has a contractual relationship." *Murtha,* 958 F.2d at 1198 (citing 42 U.S.C. § 9607(b)). The latter is variously referred to as the "innocent landowner," "third-party," or "innocent-party" defense. *See Carson Harbor,* 270 F.3d at 871; *United States v. Honeywell Int'l, Inc.,* 542 F.Supp.2d 1188, 1199 (E.D.Cal.2008) (England, J.).

Here, the City contends that plaintiff cannot satisfy either the first or fourth elements of its prima facie case. Specifically, the City argues that the sewer beneath Academy Lane is not a "facility" under CERCLA and that the City is not "within one of four classes of persons" subject to CERCLA liability. The City alternatively asserts that it is absolved from liability pursuant to CERCLA's innocent-party defense.

Similar to CERCLA, California's HSAA provides for civil actions for indemnity and contribution and expressly incorporates CERCLA's liability standards and defenses. *See Castaic Lake Water Agency v. Whittaker Corp.,* 272 F.Supp.2d 1053, 1084 (C.D.Cal.2003) ("HSAA 'create[s] a scheme that is identical to CERCLA with respect to who is liable.' " (quoting *City of Emeryville v. Elementis Pigments, Inc.,* No. 99–3719, 2001 WL 964230, at *11 (N.D.Cal. Mar. 6, 2001)) (alteration in original)); *Goe Eng'g Co., Inc. v. Physicians Formula Cosmetics, Inc.,* No. 94–3576, 1997 WL 889278, at *23 (C.D.Cal. June 4, 1997)

("California's [HSAA] imposes essentially the same standards of liability as CERCLA.").

Under the HSAA, the term "site" has the same meaning as "facility" defined in 42 U.S.C. § 9601(9); the terms "responsible party" or "liable person" refer to the four classes of persons defined in 42 U.S.C. § 9607(a); and the "defenses available to a responsible party or liable person" are those defenses specified in 42 U.S.C. § 9607(b), which include the innocent-party defense. Cal. Health & Safety Code §§ 25323.9, 25323.5. Thus, as the parties acknowledge, the City's arguments as to plaintiff's CERCLA claims apply with equal force to plaintiff's claims under the HSAA. (City's Mem. Supp. Mot. Summ. J. 7 n. 4; Pl.'s Mem. Supp. Opp'n Summ. J. 1:5–2:1.)

### B. *"Facility"*

■ CERCLA defines the term "facility" as follows:

> The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9). The conjunction "or" between subparts (A) and (B) establishes "two distinct definitions of what might constitute a facility." *Sierra Club v. Seaboard Farms Inc.,* 387 F.3d 1167, 1171 (10th Cir.2004). Thus, "[a]n area fulfilling the requirements of [subpart (A)] need not also meet the requirements of [subpart (B)] to be considered a 'facility,' and vice versa." *Id.* (quoting *United States v. Twp.*

*of Brighton,* 153 F.3d 307, 322 (6th Cir. 1998) (Moore, J., concurring)) (internal quotation marks omitted).

In light of the general language and disjunctive structure of § 9601(9), the Supreme Court and others have remarked that "the term 'facility' enjoys a broad and detailed definition." *United States v. Bestfoods,* 524 U.S. 51, 56, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998); *see, e.g., Seaboard Farms,* 387 F.3d at 1174 ("[C]ircuits that have applied the defined term "facility" have done so with a broad brush."); *Uniroyal Chem. Co., Inc. v. Deltech Corp.,* 160 F.3d 238, 245 (5th Cir.1998) ("[I]t is apparent that facility is defined in the broadest possible terms . . . ."); *3550 Stevens,* 915 F.2d at 1358 n. 10 ("[T]he term 'facility' has been broadly construed by the courts, such that 'in order to show that an area is a "facility," the plaintiff need only show that a hazardous substance under CERCLA is placed there or has otherwise come to be located there.'" (quoting *United States v. Metate Asbestos Corp.,* 584 F.Supp. 1143, 1148 (D.Ariz.1984))). Indeed, one annotation recently noted that "it does not appear that any court has ever held that one or more of the defining terms in [42 U.S.C. § 9601(9)] was inapplicable in a particular case." William B. Johnson, Annotation, *What Constitutes "Facility" Within the Meaning of Section 101(9) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. § 9601(9)),* 147 A.L.R. Fed. 469 § 2(a) (1998 & Supp.2009) [hereinafter Johnson, *What Constitutes "Facility"*].

Despite CERCLA's expansive definition of "facility," the City contends that CERCLA's "express terms" exempt its sewer from this classification. (City's Mem. Supp. Mot. Summ. J. 8:5.) To support its argument, the City ascribes great significance to the parenthetical in subpart (A):

"The term 'facility' means (A) any ... pipe or pipeline (*including any pipe into a sewer or publicly owned treatment works* ) ...." 42 U.S.C. § 9601(9)(A) (emphasis added). The City suggests that by specifically mentioning "sewer" in this parenthetical and neglecting to include it in the preceding enumerated facilities, Congress "had sewers in mind" but deliberately kept them off the list. (City's Mem. Supp. Mot. Summ. J. 8:16–17.) Similarly, the City argues that the plain meaning of "pipe or pipeline" includes sewers; therefore, the parenthetical in subpart (A) explaining that pipes connected to sewers are facilities is redundant. (City's Mem. Supp. Summ. J. 8:22–9:10.) The only way to make this parenthetical functional, the City asserts, is to conceive of sewers as non-facilities; under this interpretation, the parenthetical clarifies that pipes remain facilities even if they are connected to non-facilities. (*Id.*)

As the City acknowledges, several other courts have considered this argument and have rejected it. *See Westfarm Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n*, 66 F.3d 669, 678–80 (4th Cir. 1995); *United States v. Union Corp.*, 277 F.Supp.2d 478, 486–87 (E.D.Pa.2003); *see also United States v. Meyer*, 120 F.Supp.2d 635, 639 (W.D.Mich.1999); *City of Bangor v. Citizens Commc'ns Co.*, No. 02–183, 2004 WL 483201, at *11 (D.Me. Mar. 11, 2004) (Kravchuk, Mag. J.), *aff'd*, 2004 WL 2201217, at *1 (D.Me. May 5, 2004). Nonetheless, the City correctly notes that these decisions rely almost exclusively on the reasoning provided by the Fourth Circuit in *Westfarm*, and because these decisions are not binding on this court, the City argues that their "tortured construction of 'facility'" should be rejected. (City's Mem. Supp. Mot. Summ. J. 10:7–17.)

### 1. *The Westfarm Holding*

In *Westfarm*, a property owner brought a cost recovery action under CERCLA against the Washington Suburban Sanitary Commission ("WSSC"), a state agency that operated a sewer system. 66 F.3d at 674, 676. Like the instant case, *Westfarm* involved a dry cleaning operation that had contaminated the soil and groundwater on plaintiff's property by pouring PCE "down a sink drain into the connected sewer line." *Id.* at 674. Apparently, the PCE "was flowing [into plaintiff's property] through leaks in the sewer system." *Id.* at 673. WSSC moved for summary judgment, arguing in part that "the language of the statute evinces a Congressional intent to exclude 'publicly owned treatment works,' or POTWs, such as WSSC's sewer, from the definition of 'facility.'" *Id.* at 678. Like the City in this case, WSSC specifically argued that "to conclude that a POTW is a 'facility' would be to render the parenthetical language above, 'including any pipe into a sewer or publicly owned treatment works' surplusage, contrary to traditional rules of statutory interpretation." *Id.*

While agreeing that the parenthetical appeared to be surplusage when viewed in isolation, the Fourth Circuit proceeding to hold:

Reading CERCLA as a whole ... leads to the inescapable conclusion that Congress did not intend to exclude POTWs from liability. Congress expressly abrogated state sovereign immunity under CERCLA, thereby subjecting "facilities" owned and operated by state governments to liability. A narrow exception to the definition of "owner or operator," however, was carved to exclude state and local governments from liability when they have acquired ownership of a facility "involuntarily through bankruptcy, tax delinquency, abandonment, or

other circumstances in which the government involuntarily acquires title." ... [I]f Congress had intended to exclude state and local governments from liability in other situations ... Congress would have either: (a) excluded all state and local governments from the definition of "owner or operator," rather than limiting the exclusion to the involuntary acquisition situation; or (b) included POTWs in the list of entities excluded from the definition of "owner or operator."

*Id.* at 678–89 (citations omitted). In order to explain the apparent surplusage in the parenthetical in subpart (A), the Fourth Circuit concluded that, "[i]n the context of the entire statute, it appears that Congress added [the parenthetical] to emphasize the point that pipes leading into sewers or POTWs are the responsibility of the owner or operator of the pipes, not the sewer or POTW." *Id.* at 679.

### 2. *Limiting the City's Proposed Interpretation*

Before weighing the merits of the City's arguments and examining the Fourth Circuit's rationale in *Westfarm*, the court first notes the self-imposed limitations on the City's interpretation of subpart (A). Specifically, the City "does not assert [that] public entities are or should be generally immune from CERCLA liability." (City's Mem. Supp. Mot. Summ. J. 14:27–15:1.) This qualification to the City's argument appears necessary, given that "CERCLA expressly includes municipalities, states, and other political subdivisions within its definition of persons who can incur ... liability under § 9607," and because the Supreme Court has held that a " 'cascade of plain language' clearly demonstrates Congress aimed to abrogate sovereign immunity for the states." *Murtha,* 958 F.2d at 1198 (quoting *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 7–13, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989)).

Having acknowledged that CERCLA does not generally distinguish between private and public parties for purposes of liability, the City proceeds to claim that, "regarding sewers and waste treatment plans, Congress decided to treat public entities differently by not including such places as facilities." (City's Mem. Supp. Mot. Summ. J. 14:27–15:1.) In so arguing, the City implies that its proffered exception to CERCLA's broad definition of "facility" would be cabined to "the basic civic function[ ] of having and maintaining a sewer system." (*Id.* at 15:4–5.)

Although the City attempts to limit the scope of its proposed exception to CERCLA's definition of "facility," this limitation finds little support in the text of the statute. Assuming the parenthetical in subpart (A) evinces Congress's intent to exempt sewers from the definition of facility, there is no express language to indicate that this exemption would cover only *public* sewers. Private sewers are common sources of environmental contamination, *see, e.g., Mead Corp. v. Browner,* 100 F.3d 152, 154 (D.C.Cir.1996); *State of Vermont v. Staco, Inc.,* 684 F.Supp. 822, 832–33 (D.Vt.1988), and it would seem that the owner of a private sewer could similarly avail subpart (A)'s parenthetical as an exemption from CERCLA's definition of "facility."

Of course, applying the canon of statutory construction *noscitur a sociis,* the juxtaposition of "sewer" and "publicly owned treatment works" may suggest that only public sewers are contemplated by the word "sewer." *See James v. United States,* 550 U.S. 192, 222, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007) (*"[N]oscitur a sociis* is just an erudite (or some would say antiquated) way of saying what common sense tells us to be true: '[A] word is known by the company it keeps' " (quoting *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303,

307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961)) (second alteration in original)). However, because some sources define the term "publicly owned treatment works" to include public sewers, the word "sewer" could just as plausibly be read to refer to private sewers in order to avoid rendering "publicly owned treatment works" superfluous. *See, e.g.,* Me.Rev.Stat. Ann. tit. 38, § 414–B (" 'Publicly owned treatment works' includes sewers, pipes or other conveyances . . . ."); *Westfarm,* 66 F.3d at 678 (using the terms interchangeably).

In sum, although the City attempts to limit its interpretation of subpart (A) to apply solely to public sewers, it is difficult to articulate a persuasive, textual basis for not also exempting private sewers, which both parties agree would be inconsistent with the aims of CERCLA. (*See* City's Mem. Supp. Mot. Summ. J. 14:27–15:8; Pl.'s Mem. Supp. Opp'n Summ. J. 11:7–8); *see also United States v. Meyer,* 120 F.Supp.2d 635, 639–40 (W.D.Mich.1999) (holding that a private sewer system that had contaminated the soil and groundwater with hexavalent chromium and other hazardous materials was a "facility" under CERCLA).

### 3. *Assessing the City's Interpretation*

As to the City's claim that the "absence of sewers from the definitional list" is "quite telling," both caselaw and CERCLA's legislative history demonstrate that the language defining facility was intended to be broad and inclusive, *see Uniroyal,* 160 F.3d at 246–47; The Envtl. Law. Inst., *Superfund: A Legislative History* xviii (Helen C. Needham & Mark Henefee eds., 1982); 126 Cong. Rec. S14964–65 (1980), and there is no dispute that sewers could easily be encompassed within the meaning of "structure," "equipment," "pipe," or "pipeline." Therefore, in this context, the failure to specifically single out a particular object or edifice does not indicate congressional intent to exclude it from the expansive meaning of "facility." *See, e.g., United States v. Iron Mountain Mines, Inc.,* 812 F.Supp. 1528, 1549 (E.D.Cal.1992) (Schwartz, J.) ("While [the defendant] is correct that Congress did not specifically identify mines in this provision, Congress also did not specifically identify factories, plants, laboratories, laundromats, warehouses, dumps, or quarries—any number of places from which hazardous wastes might be released.").

Furthermore, assuming that some justification may exist for exempting public sewers from CERCLA liability, it would be strange for Congress to do so through the artful placement of a parenthetical within CERCLA's definition of "facility." As the Fourth Circuit recognized in *Westfarm,* Congress unambiguously exempted local governments from CERCLA liability for facilities acquired " 'involuntarily through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government involuntarily acquires title.' " 66 F.3d at 678 (quoting 42 U.S.C. § 9601(20)(D)). By expressly exempting municipalities in this regard, the canon of statutory construction *expressio unius est exclusio alterius* would suggest that Congress did not intend an additional exemption for municipalities with respect to sewers. *Id.* at 678–79; *see Blausey v. U.S. Tr.,* 552 F.3d 1124, 1133 (9th Cir.2009) ("[T]he enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded."); *see also Murtha,* 958 F.2d at 1199 ("These express exceptions to liability are strong evidence that municipalities are otherwise subject to CERCLA liability.").

At a more fundamental level, the City also fails to explain why Congress would exempt public sewers from the definition of "facility" as opposed to, for example, publicly owned water mains or landfills.

Under the City's proposed construction, municipalities would still be strictly liable for the release of hazardous substances from these facilities, *see, e.g., Transp. Leasing Co. v. State of Cal. (CalTrans)*, 861 F.Supp. 931, 939 (C.D.Cal.1993) (holding municipalities liable for contamination from a landfill even though their conduct constituted a "non-contributory exercise of sovereign power"), yet they would have immunity for even deliberate environmental contamination via sewers, *see, e.g., Uniroyal Chem. Co., Inc. v. Deltech Corp.*, 160 F.3d 238, 244 (5th Cir.1998) ("CERCLA liability cannot be imposed unless the site in question constitutes a facility."). The City has provided no persuasive justification for inserting such inconsistency into CERCLA's treatment of public facilities.[1] *See generally Murtha*, 958 F.2d at 1199 ("To construe CERCLA as providing an exemption for municipalities arranging for the disposal of municipal solid waste that contains hazardous substances simply because the municipality undertakes such action in furtherance of its sovereign status

would create an unwarranted break in the statutory chain of responsibility.").

While arguing that subpart (A) implicitly exempts public sewers from the definition of "facility," the City also neglects to consider the import of subpart (B), which further defines facility to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. 9601(9)(B). The City simply disregards this provision, asserting that it applies only to "*land* ... where pollutants migrate," as opposed to other objects or edifices beneath or affixed to the surface. (City's Mem. Supp. Mot. Summ. J. 8:8–9 (emphasis added); *see id.* at 12 n. 10.) This parsimonious view of subpart (B), however, is far from well-established. *See, e.g., Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F.Supp.2d 693, 708 (W.D.Ky.2003) (applying subpart (B) to include poultry houses and litter sheds); *Meyer*, 120 F.Supp.2d at 638–39 (applying subpart (B) to include private sewer lines); *Clear Lake Props. v. Rockwell Int'l Corp.*, 959 F.Supp. 763, 767–

1. In a footnote, the City refers to a Note from the Stanford Environmental Law Journal to suggest that "distinguishing treatment of sewers is consistent [with] the Resource Conservation and Recovery Act [ ("RCRA"), 42 U.S.C. §§ 6901–6992k] and ... the Clean Water Act [ ("CWA"), 33 U.S.C. §§ 1251–1387]." (City's Mem. Supp. Mot. Summ. J. 15 n. 13.) As that Note explains, however, the CWA simply "requires that industrial facilities substantially treat their waste prior to discharging it into a POTW," and the RCRA "stipulates that public sewage authorities are responsible for the management and treatment of domestic sewage." Robert M. Frye, Note, *Municipal Sewer Authority Liability Under CERCLA: Should Taxpayers Be Liable For Superfund Cleanup Costs?*, 14 Stan. Envtl. L.J. 61, 84 (1995). Therefore, insofar as these statutes relate to sewers, they are merely preventative in nature, not remedial. *See, e.g., United States v. Hartsell*, 127 F.3d 343, 350 (4th Cir.1997) (noting that the CWA "provides for the promulgation of regulations which will

*limit or prohibit* the discharge of pollutants into POTWs." (citing 33 U.S.C. § 1317) (emphasis added)); *United States v. E.I. du Pont de Nemours & Co., Inc.*, 341 F.Supp.2d 215, 237 (W.D.N.Y.2004) ("RCRA was designed to address present and prospective threats."). Far from indicating that CERCLA should not apply to sewers, the RCRA and CWA imply that Congress recognized sewers as a potential source of environmental contamination and suggest that CERCLA has a complimentary role to play. *See, e.g., S.C. Dep't of Health & Envtl. Control v. Commerce & Indus. Ins. Co.*, 372 F.3d 245, 256 (4th Cir.2004) ("Although the aims of RCRA and CERCLA are related, each serves a separate and unique purpose .... Indeed, as the Supreme Court has observed, RCRA is *not* principally designed to 'compensate those who have attended to the remediation of environmental hazards.'" (quoting *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996))).

68 (S.D.Tex.1997) (applying subpart (B) to include an underground laboratory). *See generally Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1151 (1st Cir.1989) (interpreting subpart (B) to encompass "every conceivable place where hazardous substances come to be located"); *Clear Lake,* 959 F.Supp. at 768 (stating that subpart (B) "is broad enough to encompass virtually any place at which hazardous wastes have been found to be located").

To be sure, subpart (B) may be inapplicable here because the final destination of the PCE appears to be the soil and groundwater near Suite K rather than the sewers themselves. *See United States v. Bliss,* 667 F.Supp. 1298, 1305 (E.D.Mo.1987) (explaining that subpart (A) refers to facilities that release hazardous substances, while subpart (B) refers to facilities where hazardous substances ultimately "come to be located"); (*see also* Pearlman Decl. Ex. I at 2–9, 21–23). Nonetheless, juxtaposing subpart (B) with the City's interpretation of subpart (A) illustrates a strange consequence of the City's construction of the latter; under the City's view, a sewer would not be a facility if it leaked a hazardous substance into the surrounding soil or groundwater, but it would be a facility if the hazardous substance came to remain within the sewer itself. *See Meyer,* 120 F.Supp.2d at 638–39 (finding private sewer lines to be facilities because hazardous substances were discovered therein); *see also Brookfield–N. Riverside Water Comm'n v. Martin Oil Mktg., Ltd.,* No. 90–5884, 1992 WL 63274, at *5 (N.D.Ill. Mar. 12, 1992) ("[N]ot only was the construction site a 'facility,' but after hazardous substances entered the water main, the water main too became a 'facility.'"). The City provides no justification as to why Congress would intend such asymmetry in the definition of "facility" as applied to sewers.

### 4. *Whether the City's Interpretation Is Required to Avoid Surplusage*

Having noted several weaknesses in the City's proposed interpretation of subpart (A), the court proceeds to address the City's contention that, absent this interpretation, the parenthetical in subpart (A) would be superfluous. It is well-established that courts should express a "deep reluctance to interpret a statutory provision as to render superfluous other provisions in the same enactment," *Pa. Dep't of Pub. Welfare v. Davenport,* 495 U.S. 552, 562, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990); nonetheless, this maxim is not absolute and must yield to ensuring that the overall purposes of a statute are furthered, *see United States v. Atl. Research Corp.,* 551 U.S. 128, 137, 127 S.Ct. 2331, 168 L.Ed.2d 28 (2007) ("It is appropriate to tolerate a degree of surplusage rather than adopt a textually dubious construction that threatens to render [an] entire provision a nullity."); *Lamie v. U.S. Tr.,* 540 U.S. 526, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (noting that surplusage does "not always produce ambiguity" and that the "preference for avoiding surplusage is not absolute").

As discussed previously, CERCLA is aimed at assuring "that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions." S.Rep. No. 96–848, at 13 (1980); *accord Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1455 (9th Cir.1986). To interpret subpart (A)'s parenthetical to automatically exempt public sewers from CERCLA lawsuits—notwithstanding the fault or "responsibility" of the owner or operator for any environmental harms—appears to conflict with CERCLA's comprehensive remedial purpose. It would seem, moreover, that a court should be tolerant of occasional redundancy and surplusage where, as here, the statute in question "has been criticized

frequently for inartful drafting and numerous ambiguities attributable to its precipitous passage." *Rhodes v. County of Darlington, S.C.,* 833 F.Supp. 1163, 1174 (D.S.C.1992) (quoting *Artesian Water Co. v. Gov't of New Castle County,* 659 F.Supp. 1269, 1277 (D.Del.1987)); *see Uniroyal,* 160 F.3d at 246 ("Due to its hurried passage, it is widely recognized that many of CERCLA's provisions lack clarity and conciseness. A multitude of courts have roundly criticized the statute as vague [and] contradictory ...."); *La.-Pac. Corp. v. Beazer Materials & Servs., Inc.,* 811 F.Supp. 1421, 1428 (E.D.Cal.1993) (Karlton, J.) ("Given the haste in which [CERCLA] was drafted, it is not unreasonable to conclude that the critical comma was inadvertently omitted." (citations omitted)).

More importantly, *Westfarm* 's alternative, non-superfluous interpretation of subpart (A)'s parenthetical—while perhaps underdeveloped in that case—is by no means "Procrustean." (City's Mem. Supp. Summ. J. 10:2.) In *Westfarm,* the Fourth Circuit suggested that the parenthetical "emphasize[d] the point that pipes leading into sewers or POTWs are the responsibility of the owner or operator of the pipes, not the sewer or POTW." *Id.* at 679. A substantial body of caselaw has considered the issue to which the Fourth Circuit alluded, namely, how to delineate among several sites, structures, or items falling under CERCLA's definition of "facility" in order to determine the relevant owners, operators, and other responsible parties. *See, e.g., Sierra Club v. Seaboard Farms Inc.,* 387 F.3d 1167, 1170–71 (10th Cir. 2004); *United States v. Twp. of Brighton,* 153 F.3d 307, 312–13 (6th Cir.1998).

For example, in *Brighton,* a township sought to escape liability for response costs incurred by the federal government in cleaning up a "dumpsite" used by the township and other parties. 153 F.3d at 311–12. The township argued that the "facility" in question should not be defined to include the township's ownership interest because the township only used the southwest corner of the site, which was separate from the "hot zone" of the government's cleanup efforts. *Id.* at 313. The Sixth Circuit rejected this argument, however, concluding that "even though township residents generally left their refuse in the southwest corner, it appears that the entire property was operated together as a dump." *Id.*

Pipes and pipelines present a unique aspect of this problem; because pipes are "long hollow cylinders ... used for conducting a fluid, gas, or finely divided solid," *Webster's Third International Dictionary* 1721 (1976), a court may be uncertain as to where these types of "facilities" begin or end. Indeed, as the Sixth Circuit noted in *Brighton,* the boundaries of a facility need not be coterminous with the contamination. *See id.* at 313 ("[A]n area that cannot be reasonably or naturally divided into multiple parts or functional units should be defined as a single 'facility,' even if it contains parts that are non-contaminated.").

Thus, in light of this uncertainty, the parenthetical in subpart (A) indicates that pipes and pipelines may be divided into specific ownership-segments for purposes of determining the relevant "facilities" under CERCLA. This interpretation has the serviceable result of enabling cost recovery actions against owners and operators of particular portions of a pipeline, rather than against all of the unaffiliated owners and operators involved in a network of pipes. Otherwise, every time a private pipeline leaked hazardous substances into the subsurface, the owners of sewers or treatment works would be implicated simply by having their equipment connected to the network. *See Westfarm,* 66 F.3d at 669 ("[P]ipes leading into sewers or POTWs are the responsibility of the owner

or operator of the pipes, not the sewer or POTW."). Therefore, while the redundancy identified by the City does not necessarily require resolution, the court finds that the interpretation provided here and in *Westfarm* adequately addresses the issue in a manner more consistent with CERCLA's treatment of municipalities than the City's proposed construction.

5. *The Ninth Circuit and Westfarm*

In its criticism of *Westfarm*, the City also argues that the Fourth Circuit's analysis was questioned by the Ninth Circuit in *Fireman's Fund Insurance Co. v. City of Lodi, California*, 302 F.3d 928 (9th Cir. 2002). In that case, the City of Lodi sought to enforce a municipal ordinance modeled after CERCLA and the HSAA to remedy contamination resulting from the disposal of PCE in municipal sewers. *See id.* at 934–37. To determine whether the municipal ordinance was preempted by CERCLA and the HSAA, the Ninth Circuit noted that the argument in favor of preemption was "rooted in the ... assumption that Lodi is a [Potentially Responsible Party ("PRP")]." *Id.* at 946. The Ninth Circuit continued:

> While we decline to decide whether Lodi is a PRP on the record before us, we note that it is doubtful whether Lodi may be considered a PRP merely as a result of operating its municipal sewer system. *See Lincoln Prop[s]., Ltd. v. Higgins*, 823 F.Supp. 1528, 1539–44 (E.D.Cal.1992) (holding that a municipal operator of a sewer system that leaked hazardous waste could rely on a third-party defense to avoid liability under CERCLA). *But see Westfarm Assocs. v. Wash. Suburban Sanitary Comm'n*, 66 F.3d 669, 675–80 (4th Cir.1995) (holding that a municipal operator of a sewer system is liable for the acts of a third party that discharges hazardous waste into the system). *See also* Robert M. Frye, *Municipal Sewer Authority Lia-*

*bility Under CERCLA: Should Taxpayers Be Liable For Superfund Cleanup Costs?*, 14 Stan. Envtl. L.J. 61 (1995) (criticizing the *Westfarm* decision and arguing that municipalities should not bear CERCLA liability for operating sewer systems because some leakage from sewers is unavoidable and the parties dumping chemicals into the sewer, not the operator of the sewer, is the responsible party). We remand to the district court the question of whether Lodi is a PRP.

*Id.*

Although this dicta evinces some disagreement with *Westfarm*, this tension appears to center on the application of the innocent-party defense rather than the interpretation of "facility." Indeed, the case favorably cited by the Ninth Circuit—*Lincoln Properties, Ltd. v. Higgins*—involved a county sewer operator that successfully asserted the innocent-party defense; the parties in *Lincoln Properties*, however, had expressly stipulated that the public sewer in question was a "facility" under CERCLA. 823 F.Supp. 1528, 1533 n. 2, 1539–44 (E.D.Cal.1992) (Levi, J.). The explanatory parentheticals for *Westfarm* and Frye's Note also do not reference any discussion of the term "facility" under CERCLA. *Fireman's Fund*, 302 F.3d at 946. On remand from the Ninth Circuit, moreover, neither the district court nor the parties in *Fireman's Fund* interpreted the Ninth Circuit to question whether a municipal sewer was a "facility" under CERCLA; instead, the district court concluded that the City of Lodi was in fact a PRP. *See Fireman's Fund Ins. Co. v. City of Lodi, Cal.*, 296 F.Supp.2d 1197, 1206–07 (E.D.Cal.2003) (Damrell, J.).

Accordingly, when the Ninth Circuit's reference to *Westfarm* is examined in context, there is no indication that the Ninth Circuit would interpret "facility" differently than the Fourth Circuit.

#### 6. *The City's Policy Arguments*

The City finally proffers several policy arguments to support an exemption for its public sewer from CERCLA's definition of "facility." These policy arguments generally invoke the City's perception of the equities in this case, asserting that CERCLA's purpose "is thwarted by imposing liability on a city merely because the polluter uses the public sewer." (City's Mem. Supp. Mot. Summ. J. 13:4–5.) The City reiterates that it was "unaware of the contaminant's presence" and distinguishes *Westfarm* and its progeny on the grounds that they "involved *deliberate/knowing conduct* by the party responsible for the sewer." (*Id.* at 10:8–21; *see id.* at 14:13 ("[The City] derived no economic benefit from the disposal of PCE wastewater into the sewer."); *id.* at 14:13 ("[E]ven assuming the sewer did leak PCE, no evidence [suggests] the sewer was thus faulty in the sense of [its] intended function and foreseeable usage.").) These arguments, however, are unavailing. As courts have repeatedly explained,

> CERCLA is a strict liability statute, and liability can attach even when the generator has no idea how its waste came to be located at the facility from which there was a release. The three statuto-

ry defenses enumerated in § 9607(b), including defenses for "an act of God," "an act of war," or "an act or omission of a third party other than an employee or agent of the defendant," are "the only [defenses] available, and ... the traditional equitable defenses are not."

*Pakootas v. Teck Cominco Metals, Ltd.,* 452 F.3d 1066, 1078 (9th Cir.2006) (quoting *California ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.,* 358 F.3d 661, 672 (9th Cir.2004)) (citation omitted) (alteration in original); *see La.-Pac. Corp. v. Beazer Materials & Servs., Inc.,* 811 F.Supp. 1421, 1429 (E.D.Cal.1993) (Karlton, J.) ("The imposition of strict liability means that defendants may be required to contribute to a cleanup even though they were not responsible, in a culpability sense, for the creation of the condition.").

Therefore, although the City's policy arguments may lend support to its innocent-party defense, they do not comport with the strict-liability scheme underlying a prima facie case for cost recovery. To be sure, while a party's relative culpability may influence the applicability of the innocent-party defense in a particular case, it cannot dictate the meaning of the word "facility" to be applied in all cost recovery lawsuits.[2]

---

**2.** While immaterial to the meaning of "facility," the City's arguments regarding the allocation of responsibility may also be pertinent to the contribution phase of this action. CERCLA specifically instructs that "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). Factors which may be considered include:

(1) The ability of the parties to distinguish their contribution to the discharge, release, or disposal of hazardous waste;

(2) The amount of the hazardous waste involved;

(3) The degree of the toxicity of the hazardous waste involved;

(4) The degree of care exercised by the parties with respect to the hazardous waste concerned; and

(5) The degree of cooperation by the parties with government officials to prevent any harm to the public health or the environment.

*Weyerhaeuser Co. v. Koppers Co., Inc.,* 771 F.Supp. 1420, 1426 (D.Md.1991). Other factors include a party's knowledge or acquiescence to the release of hazardous waste and whether a party has benefitted from the contamination. *Id.* "Thus, the contribution stage, and not the liability stage, is appropriate for considerations of the ... relative degree of fault." *Nw. Mut. Life Ins. Co. v. Atl. Research Corp.,* 847 F.Supp. 389, 396 (E.D.Va.1994).

Accordingly, having considered the merits of the City's proposed interpretation exempting sewers from CERCLA's definition of "facility," including whether the exemption could be limited to public sewers, whether it would be consistent with other statutory provisions and CERCLA's policy goals, and whether it is supported by caselaw within and beyond the Ninth Circuit, the court concludes that the sewer in this case is a "facility" for purposes of CERCLA.

### C. *"Owner" or "Operator"*

■ The fourth element of a prima facie case for cost recovery requires that the defendant be "within one of four classes of persons subject to the liability provisions of [42 U.S.C. § 9607(a)]." *3550 Stevens Creek Assocs. v. Barclays Bank of Cal.*, 915 F.2d 1355, 1357 (9th Cir.1990). Here, the parties agree that only two of the four classes allegedly apply to the City, namely, "the [present] owner and operator of a vessel or a facility" and "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(1)(2); (*see* City's Mem. Supp. Summ. J. 6:14–23; Pl.'s Mem. Supp. Opp'n Summ. J. 16:12–21:14; TAC ¶¶ 14, 30–31.)

The City further submits that, "[w]ithout question," it "owned and operated the sewer main." (City's Mem. Supp. Summ. J. 15:11.) Nonetheless, the City contends that "even if a municipal sewer is generally deemed a facility, it is not *the* facility by which owner or operator status is gauged" in this case. (*Id.* at 15:11–13.) The City suggests that "there are not *multiple* facilities here ... but rather one—the entire area of land to be remedied." (*Id.* at 15:22–23.) Therefore, because the City is not the owner or operator of the "entire area of land to be remedied," the City argues that plaintiff cannot satisfy the fourth element of its prima facie case.

None of the cases cited by the City suggest that, when confronted with several facilities, a court must conceive of them as a single site to determine the relevant owners and operators. Rather, the cited authorities indicate that courts are simply permitted to so in appropriate cases. *See, e.g., Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.*, 191 F.3d 409, 419 (4th Cir.1999) ("This is not to say that every widely contaminated property must be considered a single facility. But where, as here, the only arguments in favor of designating multiple facilities are weak in themselves and merely represent thinly-veiled attempts by a party to avoid responsibility for contamination, designation of the property as a single facility is appropriate."); *Cytec Indus., Inc. v. B.F. Goodrich Co.*, 232 F.Supp.2d 821, 836 (S.D.Ohio 2002) ("This court concludes that usually, although perhaps not always, the definition of facility will be the entire site or area, including single or contiguous properties, where hazardous wastes have been deposited as part of the same operation or management.").

To be sure, courts and commentators have frequently observed that "there does not appear to be a limit to the number of 'facilities' that can be created by the migration of hazardous substances, even if hazardous substances 'come to be located' at several locations in a particular case." Johnson, *What Constitutes "Facility"* § 2(b); *see United States v. Meyer*, 120 F.Supp.2d 635, 639 (W.D.Mich.1999) ("Because hazardous substances may come to be located in several discrete locations in a given case, there may be several 'facilities' related to a single hazardous waste discharge or disposal."); *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, No. 92–5068, 1995 WL 866395, at *4 (E.D.Cal. Nov. 15, 1995) (Wanger, J.) ("Contrary to Brown & Bryant's arguments, a single geographical location may contain multiple 'facilities.' 'Facilities'

may even be contained within other 'facilities.'"); *Brookfield–N. Riverside Water Comm'n v. Martin Oil Mktg., Ltd.,* No. 90–5884, 1992 WL 63274, at *5 (N.D.Ill. Mar. 12, 1992) ("[N]ot only was the construction site a 'facility,' but after hazardous substances entered the water main, the water main too became a 'facility.'").

Although certain considerations may counsel in favor of a single facility in some cases, *see Cytec,* 232 F.Supp.2d at 836, the primary source for determining the number of relevant facilities is the plaintiff's complaint, *see La.-Pac. Corp. v. Beazer Materials & Servs., Inc.,* 811 F.Supp. 1421, 1431 (E.D.Cal.1993) (Karlton, J.); *Burlington N. R.R. Co. v. Woods Indus., Inc.,* 815 F.Supp. 1384, 1389–90 (E.D.Wash.1993); *see also United States v. Atchison, Topeka & Santa Fe Ry. Co.,* Nos. 92–5068 et al., 2003 WL 25518047, at *47 (E.D.Cal. July 15, 2003) (Wanger, J.) ("If anything, courts defer to a plaintiff's definition of the facility because the plaintiff is the master of its claim and should be allowed to allege or conceptualize the facility in any manner to suit liability, as long as the asserted definition falls within the very broad statutory definition."), *rev'd on other grounds,* 479 F.3d 1113 (9th Cir.2007), *rev'd,* —— U.S. ——, 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009).

For example, in *Burlington* the defendant owned a "fruit drenching" business on a leasehold "immediately adjacent" to the plaintiff's property, and over several decades the defendant allowed hazardous pesticides to escape and seep into the soil on plaintiff's parcel. 815 F.Supp. at 1387. Although the defendant's leasehold and the plaintiff's parcel were situated on a contiguous area of land, the court looked to the theory of liability alleged in the complaint and concluded that "the drenching opera-

tion constitute[d] a separate CERCLA facility." *Id.* at 1390. Similarly, in *Beazer,* the court adopted the plaintiff's single-site theory of liability and rejected defendants' attempt to "parcel out [the] site into various 'facilities,'" noting that the plaintiff was the "master of its complaint" and had "the discretion to formulate the legal theories on which it would base its claim." 811 F.Supp. at 1431. Together, *Burlington* and *Beazer* illustrate that, absent unusual circumstances or obvious gamesmanship, the court should determine the appropriate number of facilities in light of plaintiff's theory of liability.

Here, plaintiff's TAC unambiguously alleges that the City's sewer is a facility separate from the Woodland Shopping Center site. (*See* TAC ¶ 55 ("The Site and the sewer main on Academy Lane … are each a 'facility' within the meaning of CERCLA ….").) Unlike the cases cited by the City, permitting plaintiff to allege the existence of two facilities in this case is not analogous to the "ridiculous" proposition that "each barrel in a landfill is a separate facility." *Union Carbide Corp. v. Thiokol Corp.,* 890 F.Supp. 1035, 1043 (S.D.Ga.1994); *see Axel Johnson,* 191 F.3d at 417. Nor would plaintiff's theory result in "piecemeal litigation," such as where "each separate facility would give rise to a separate cause of action." *Cytec,* 232 F.Supp.2d at 836. Instead, the relevant area here can be "reasonably or naturally divided into multiple parts or functional units," namely, the Woodland Shopping Center and the sewer main owned by the City beneath Academy Lane. *United States v. Twp. of Brighton,* 153 F.3d 307, 313 (6th Cir.1998). Accordingly, because the City concedes that it is the owner and operator of the sewer beneath Academy Lane,[3] and because this sewer is a "facili-

---

**3.** At oral argument, the City qualified its concession by asserting that, although it owned and operated the sewer, it does not meet the

definition of an owner or operator under CERCLA. In the court's view, however, the verity of this qualification requires conceiving

ty" under CERCLA, plaintiff has satisfied the fourth prong of its prima facie case.

### D. Innocent–Party Defense

"An otherwise liable party may avoid CERCLA liability only by establishing one of the three affirmative defenses set forth in 42 U.S.C. § 9607(b)." *Lincoln Props., Ltd. v. Higgins,* 823 F.Supp. 1528, 1539 (E.D.Cal.1992) (Levi, J.). "Because CERCLA is a strict liability statute with few defenses, [§ ] 9607(b) . . . is narrowly construed." *United States v. Honeywell Int'l, Inc.,* 542 F.Supp.2d 1188, 1199 (E.D.Cal.2008) (Damrell, J.) (citing *Lincoln Props.,* 823 F.Supp. at 1537, 1539); *see Carson Harbor Vill., Ltd. v. Unocal Corp.,* 270 F.3d 863, 883 (9th Cir.2001) (en banc) ("[T]o be sure, Congress intended the defense to be very narrowly applicable, for fear that it might be subject to abuse.").

■ Here, the City contends that it is absolved from liability through § 9607(b)(3), the innocent-party defense. To establish this defense, a defendant must prove by a preponderance of the evidence that (1) the release or threat of release · of hazardous substances was caused solely by the acts of a third party and (2) the defendant exercised due care with respect to the hazardous substances and took precautions against foreseeable third-party acts or omissions.[4] *See Castaic Lake Water Agency v. Whittaker Corp.,* 272 F.Supp.2d 1053, 1079–80 (C.D.Cal. 2003); *see also* 42 U.S.C. § 9607(b)(3).

As the text of § 9607(b)(3) makes plain, this provision is structured as an affirmative defense, and the City would have the burden of establishing it at trial. *See Car-*

son Harbor, 270 F.3d at 882–83; *United States v. Stringfellow,* 661 F.Supp. 1053, 1062 (C.D.Cal.1987); *see also* Rosemary J. Beless, *Superfund's "Innocent Landowner" Defense: Guilty until Proven Innocent,* 17 J. Land Resources & Envtl. L. 247, 249–50 (1997). Therefore, in order to grant the City's motion for partial summary judgment on the basis of this affirmative defense, the City "must make a showing sufficient for the court to hold that no reasonable trier of fact" could fail to find—by a preponderance of the evidence—that it satisfies the requirements of § 9607(b)(3). *Ctr. For Biological Diversity v. Abraham,* 218 F.Supp.2d 1143, 1153 (N.D.Cal.2002) (citing *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986)); *see id.* at 1153–54 ("In such a case, the moving party 'must establish beyond peradventure *all* of the essential elements of its claim or defense to warrant judgment in [its] favor.' " (quoting *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986)) (alteration in original)).

#### 1. Solely Caused by Third–Parties

■ In applying the "sole cause" requirement of § 9607(b)(3), the court in *Lincoln Properties* previously noted that it was "unclear whether Congress intended to make reference to established concepts of causation, and, if so, which ones." 823 F.Supp. at 1540. After a thorough examination of the CERCLA's text and legislative history, as well as extant caselaw and similar statutes, the court concluded that this element "incorporates the concept of proximate or legal cause." *Id.* at 1542.

Under this standard, "[i]f the defendant's release was not foreseeable, and if

---

of the entire contaminated site as a single facility, which the court declines to do.

4. The innocent-party defense also requires that "the third party was not an employee or agent of the defendant." *Castaic Lake,* 272

F.Supp.2d at 1079; *see* 42 U.S.C. § 9607(b)(3). That aspect of the defense, however, is undisputed in the instant case. (*See* Pl.'s Opp'n City's Stmt. Undisputed Facts No. 7; City's Mem. Supp. Mot. Summ. J. 22:16–18.)

its conduct—including acts as well as omissions—was 'so indirect and insubstantial' in the chain of events leading to the release, then the defendant's conduct was not the proximate cause of the release and the third party defense may be available." *Id.* at 1542. The Eastern District of California has continued to apply this standard, and several courts in other districts have also adopted it. *See Honeywell,* 542 F.Supp.2d at 1199; *United States v. Iron Mountain Mines, Inc.,* 987 F.Supp. 1263, 1274 (E.D.Cal.1997) (Levi, J.); *see also Castaic Lake,* 272 F.Supp.2d at 1081; *Advanced Tech. Corp. v. Eliskim, Inc.,* 96 F.Supp.2d 715, 718 (N.D.Ohio 2000); *United States v. Meyer,* 120 F.Supp.2d 635, 640 (W.D.Mich.1999).

The only evidence the City presents to negate proximate causation is the undisputed fact that the Taeckers poured PCE into a floor drain connected to the sewer and that this violated state and local laws. (Pl.'s Opp'n City's Stmt. Undisputed Facts Nos. 6, 8; *see* City's Reply 14:19–21; City's Mem. Supp. Summ. J. 22:16–18.) While it is undisputed that the Taeckers were *a* cause of the contamination, this fact alone does not demonstrate that they were the *sole* cause, i.e., that the Taecker's activities were unforeseeable. Indeed, the fact that the Taeckers' conduct violated state and local law—standing alone—does not render this conduct unforeseeable as a matter of law.[5] Restatement (Second) of Torts § 448 (1965); *see Benner v. Bell,* 236 Ill.App.3d 761, 767, 177 Ill.Dec. 1, 602

N.E.2d 896 (1992) ("[T]he negligent, or even criminal, act of a third party which is a cause of the injury, may not insulate a defendant from liability where that intervening cause is foreseeable."); *see also, e.g., Abdallah v. Caribbean Sec. Agency,* 557 F.2d 61 (3d Cir.1977) (holding that the negligent maintenance of a burglar alarm may be considered the proximate cause of a burglary, notwithstanding an intervening criminal act).

Although the City provides scant reason to conclude that the Taeckers' conduct was unforeseeable, plaintiff has adduced evidence suggesting the contrary. First, it is evident that the City was aware of the location of the sewer beneath Academy Lane, as its presence has been noted on public subdivision maps since 1928. (*See* Pearlman Decl. Ex. J. ("Dickson Report") at 4.) Building inspection records in the City's custody also indicate that it was aware of the dry cleaning operation next to Academy Lane and that the business had obtained permits to operate machinery that discharged dry cleaning solvents. (*See* Pearlman Decl. Ex. O.) City documents also suggest that the Sunshine Cleaners, as well as other dry cleaners in Woodland, were subject to inspection relating to the City's industrial wastewater pretreatment program in September 1991. (*See* Pearlman Decl. Ex. D1 at 15.) In March 1992, moreover, the RWQCB issued a report indicating that "leakage through the sewer lines is the major avenue

---

5. In *Lincoln Properties,* the court asserted—without citation to legal authority—that "[t]he County cannot be expected to 'foresee' that its ordinance prohibiting the discharge of cleaning solvents will be violated." *Id.* at 1543 n. 25. The court later stated—again, without citation to legal authority—that "[v]iolations of the law are not 'foreseeable acts'; thus, the County did take reasonable precautions." *Id.* at 1544. Although the defendant in *Lincoln Properties* ultimately came forward with additional evidence to satisfy its burden on summary judgment, *see id.* at 1544, to the extent that *Lincoln Properties* suggests that a third-party's violation of the law is *per se* unforeseeable, the court must respectfully part ways with that decision, *see, e.g., Tolbert v. Tanner,* 180 Ga.App. 441, 444, 349 S.E.2d 463 (1986) ("We find that under the facts of this case, a jury could reasonably conclude that Brown's criminal action was foreseeable and that appellees were negligent .... The trial court, therefore, erred by granting summary judgment in favor of these appellees.").

through which PCE is introduced to the subsurface." Cal. Reg'l Water Quality Control Bd., *Dry Cleaners—A Major Source of PCE in Ground Water* 2 (1992) [hereinafter, RWQCB, *Dry Cleaners*], available at http://www.swrcb.ca.gov/rwqcb5/water_issues/site_cleanup/.[6] That report specifically stated:

> Based on site inspections, the majority of the cleaners had only one discharge point and that was to the sewer. Because of these discharges, staff investigated sewer lines as a possible discharge point for PCE to the soils. Samples taken from these lines indicated that liquids or sludges with high concentrations of PCE are lying on the bottom of the sewer.

*Id.* at 10.

Of course, plaintiff's evidence is by no means conclusive; for example, because the Taeckers' disposal of wastewater occurred between 1974 and 1991, plaintiff's evidence—particularly the RWQCB report issued in 1992—does not necessarily demonstrate that the City could have foreseen the Taeckers' activities from the outset. Nonetheless, it is undisputed that the City did not take steps to remedy the leaks in its sewer until 2004 (*see* Pearlman Decl. Ex. H ("City's Resp. Interrogs.") Nos. 3, 6, 11–13), and expert testimony suggests that PCE can continue to leak from sewers long after it is originally deposited therein (*see* Dickson Report 6); *see also* RWQCB, *Dry Cleaners* 10. Furthermore, defendant—not plaintiff—has the burden of establishing the innocent-party defense, and in light of the foregoing evidence, genuine issues of material fact remain as to whether the City was a proximate cause of a least some of the contamination.

### 2. Due Care and Precautions Against Foreseeable Acts or Omissions

■ The second aspect of the innocent-party defense—whether defendant "exercised due care" and took appropriate "precautions"—also involves the foreseeability of third-party conduct; therefore, while the City's failure to carry its burden on the "sole cause" element is fatal to its innocent-party defense, *see Honeywell,* 542 F.Supp.2d at 1200, a full discussion of both elements of the defense is often appropriate, *see Lincoln Props.,* 823 F.Supp. at 1542–44.

Although the City again bears the burden of demonstrating that it exercised due care and took appropriate precautions, the City asserts that "no evidence, human or documentary, pertaining to the sewer's construction, inspection[,] or repair until the early 1990's exists." (City's Reply 14:25–27.) Despite this dearth of evidence, the City nonetheless contends that it exercised due care and took appropriate precautions because the Taeckers' disposal of PCE into the sewer was unforeseeable. (*Id.* at 15:28–16:2 (arguing that the "critical inquiry" is "whether the presence of PCE in the sewer was foreseeable" and whether, "when that foreseeability arose, ... [the City] took reasonable steps to prevent [contamination].").)

In a sense, the City's argument is circular; although the City contends that no inspection or maintenance of the sewer was required because the disposal of PCE was unforeseeable, the disposal of PCE may very well have been unforeseeable because of the City's failure to inspect or maintain the sewer. The innocent-party defense, however, "does not sanction ... willful or negligent blindness." *United*

---

**6.** Although this report was not submitted for purposes of the City's motion for partial summary judgment, the report is referenced in the TAC (*see* TAC ¶ 31), is relied upon by plaintiff's expert (*see* Dickson 3, 6), and is an official government publication. Accordingly, the court may properly take judicial notice of this document. *See, e.g., Corrie v. Caterpillar, Inc.,* 503 F.3d 974, 978 n. 2 (9th Cir.2007).

*States v. Monsanto Co.*, 858 F.2d 160, 169 (4th Cir.1988); *United States v. A & N Cleaners & Launderers, Inc.*, 854 F.Supp. 229, 243 (S.D.N.Y.1994) ("Willful or negligent ignorance about the presence of or threats associated with hazardous substances does not excuse a PRP's non-compliance with [the requirements of due care and appropriate precautions]."); *United States v. Bliss*, 667 F.Supp. 1298, 1304 n. 3 (E.D.Mo.1987) ("[W]illful ignorance of how a third party disposes of a hazardous substance would preclude use of [the innocent-party] defense.").

Here, the City provides no evidence to suggest that, even absent notice of the presence of PCE, its maintenance of the sewer was appropriate under the circumstances. In contrast, plaintiff has proffered the expert opinion of Bonneau Dickson, a professional sanitary engineer, which states:

> Documents disclosed by the City included no proactive sewer maintenance management system. There were no studies of leakage into the sewer system, no written maintenance program, no sewer master plan, and no prioritization of sewer maintenance. Things of these types are essential to proactive management of a sewage collection system.
>
> . . .
>
> Such a reactive maintenance policy and program is inadequate to prioritize the ancient sewer line at the Woodland Shopping Center for study and maintenance or to determine that it was in poor condition and was leaking.

(Dickson Report 6.) Dickson's report also indicates that there were "numerous defects in the existing sewer system" including "40 cracked areas and several separated joints, chipped joints, and/or sags." (*Id.* at 5.) Dickson further opined that "the rate of sewer system leakage inevitably tends to get worse as the sewers age" and that the City's sewer "is 78 years old and thus well past its expected service life." (*Id.* at 4–5.) Ultimately, the City does not dispute that it took no remedial action with respect to its sewer until May 2004, when, having been sued in connection with the contamination near the Woodland Shopping Center, the City "sleeved" the sewer line to prevent future leakage. (City's Resp. Interrogs. No. 3.)

In light of the record currently before the court, this case stands in stark relief to the cases upon which the City relies for its innocent-party defense. For example, in *Lincoln Properties*, defendant established that it had "exercised due care and taken reasonable precautions with respect to its sewer system" and that its "sewer lines were built and have been maintained in accordance with industry standards." 823 F.Supp. at 1544. Similarly, in *Castaic Lake*, the defendants "offer[ed] evidence that their wells were designed and installed in accordance with applicable construction standards at the time, including pollution prevention standards." 272 F.Supp.2d at 1083. The City, however, offers no such evidence here; instead, plaintiff has adduced evidence suggesting that the City practiced "willful or negligent blindness" in maintaining its sewer. Accordingly, having addressed the second aspect of the innocent-party defense, the court again finds that genuine issues of material fact preclude partial summary judgment in the City's favor.

### III. *Conclusion*

In light of the expansive definition of "facility" under CERCLA and the flexibility plaintiff enjoys in structuring its theory of liability, the City cannot establish that its ownership of the sewer beneath Academy Lane eschews strict liability under CERCLA and the HSAA. Furthermore, because genuine issues of material fact remain as to whether the Taeckers were the sole cause of the contamination and whether the City exercised due care and

took appropriate precautions, the City similarly fails to satisfy the innocent-party defense. Accordingly, the court must deny the City's motion for partial summary judgment.

IT IS THEREFORE ORDERED that the City's motion for partial summary judgment be, and the same hereby is, DENIED.